IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Brabham Oil Company, Inc., | C/A No. 5:24-1170-JFA |
| Plaintiff, | |
| v. | |
| Fuel Trader Supply, LLC, Blue Earth Resources, Inc., Fuel Trader Resource Management, Inc., Platinum Equity Advisors, LLC, William R. Eaton, Scott M. Boruff, Charles B. Lobetti III, and Gary W. Ford, Jr., | **OPINION AND ORDER** |
| Defendants. | |

This matter is before the Court on multiple dispositive motions. Defendant William R. Eaton ("Eaton") has filed a Motion to Dismiss (ECF No. 37), and Defendants Fuel Trader Resource Management, Inc. ("FTRM"), Scott M. Boruff ("Boruff"), Charles B. Lobetti III ("Lobetti") and Gary W. Ford, Jr. ("Ford") have separately filed their own Motion to Dismiss (ECF No. 36). Defendant Eaton argues that Plaintiff's Amended Complaint fails to set forth specific factual allegations "from which a court could reasonably infer that Mr. Eaton is liable to Plaintiff under any theory set forth" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 37, p. 1). Defendants FTRM, Boruff, Lobetti, and Ford argue that this court lacks personal jurisdiction over them and that Plaintiff's claims against them should accordingly be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure. (ECF No. 36, p. 1). Eaton's Motion to Dismiss is granted in part and denied in part, and Defendants FTRM, Boruff, Lobetti, and Ford's Motion to Dismiss is denied in its entirety.

## I.    FACTUAL AND PROCEDURAL HISTORY

This case arises out of the breakdown of a longstanding business relationship between Plaintiff Brabham and the moving Defendants FTRM, Eaton, Boruff, Lobetti, and Ford.[1] Plaintiff is a company that buys and sells wholesale fuel, and Defendants also work in the oil and gas industry. Plaintiff first began its business dealings with Eaton in 2007, prior to the formation of FTRM and FTS. (ECF No. 27, p. 6). FTRM was formed in 2012, and FTS was formed in 2013—and Eaton was co-owner of both entities.[2] *Id.* In 2018, Plaintiff shifted from purchasing its own fuel supply to funding the purchase of fuel through FTS. *Id.* This new relationship, called a "buy-sell" relationship by Plaintiff, required Plaintiff to pay FTS for the purchase of "certain fuel products." *Id.* FTS would purchase those products, and once it sold them to FTS customers, it would repay Brabham for all money received plus interest. *Id.* From 2018 until 2022, Plaintiff was timely repaid the money it was owed, and the parties' business relationship remained intact. *Id.* at 7. In September of 2022, FTS and FTRM were acquired by BERI. *Id.* at 8. Defendants Ford, Eaton, Boruff, and Lobetti were all executives at BERI at the time of the acquisition. *Id.* Also, in September 2022, FTS received what the Plaintiff calls the "2022 FTS Audit Report," which "indicated FTS had recurring negative cash flows" and suggested that the company might not be able to continue operations. *Id.* at 7.

After FTS and FTRM were acquired by BERI, Eaton began to discuss a new "buy-sell" relationship with Plaintiff. Eaton visited Plaintiff in South Carolina to discuss a possible new agreement with BERI in November of 2022. Ford and Boruff made a second visit with Eaton the following month to discuss the same in South Carolina at Plaintiff's offices. (ECF No. 27, pp. 11–12). In January of 2023, Plaintiff, FTS, and BERI entered into a new "buy-sell" agreement which

---

[1] Defendant Platinum Equity Advisors, LLC, has not made any dispositive motion before the Court at this time.
[2] Plaintiff states that Eaton became the 100% sole member of both FTS and FTRM in 2022.

provided that Plaintiff would place and fund orders from FTS; FTS would then repurchase those goods from Plaintiff; FTS would sell the goods to its customers; and FTS would then repay Plaintiff out of monies received from its customers before using the money received for another purpose. *Id.* 12.[3] Plaintiff and FTS consummated 165 "batch transactions" in 2023, prior to the breakdown of the parties' relationship. *Id.* at 15. Plaintiff alleges that both FTS and BERI were failing at the time that this agreement was negotiated and that all Defendants were aware of this and nonetheless misled Plaintiff as to FTS's and BERI's financial condition. *Id.* at 24.[4]

In the Spring of 2023, FTS began to ask for extensions on its payment deadlines under the buy-sell agreement, which Plaintiff initially approved, and after which FTS ultimately made payment. *Id.* at 15-16. In August of 2023, FTS asked for additional extensions of other payments due to Plaintiff under the Agreement. *Id.* at 17. Plaintiff alleges that Eaton, Boruff, Lobetti, and Ford were involved with and aware of these requests for extensions. By October 2023, FTS had not made payment under the requested extensions. Plaintiff contends that Defendants acknowledged that they diverted "settled funds" owed to Plaintiff under the buy-sell agreement to make other purchases. *Id.* at 19. Defendants then proposed "liquidating [] Rack Fuel Inventories" and using the sale proceeds "to pay down the Brabham debt."[5] *Id.* at 21. The parties' efforts to resolve the non-payment of funds ultimately reached an impasse after Defendants liquidated the

---

[3] In addition to the buy-sell agreement, BERI issued 500,000 shares of common stock to McCully Development Group, LLC, an entity associated with Plaintiff. BERI promised that it would pay Plaintiff the difference between a $4/share price and the actual shares' price as of December 31, 2024, in lieu of a percentage of FTS and FTRM's monthly profits that Plaintiff received under the parties' prior buy-sell arrangement. (ECF No. 27, pp. 12-13).

[4] Plaintiff primarily points to three things as support for this allegation: the 2022 FTS Audit Report; a May 2023 audit of BERI's balance sheets which indicated a "history of losses, an accumulated deficit," a lack of cash generated from operations, and that BERI had defaulted on a $5 million loan as of February 2023; and the "interim consolidated financial statements of BERI" that were issued in August 2023, which described a net loss of $6 million over the preceding six months, lower-than-anticipated margins following the acquisition of FTS and FTRM, and a notice of default on its $5 million "business loan." (ECF No. 27, pp. 16–17).

[5] Rack Fuel Inventories refers to "fuel inventory and/or deposits with fuel companies" that Defendants allegedly purchased using funds diverted from FTS. (ECF No. 27, p. 19).

Rack Fuel Inventories but only paid Plaintiff $300,000 of the $2 million obtained from the sale. *Id.* at 21–22. Plaintiff was informed in December of 2023 that FTS was soon to be liquidated, and Plaintiff was further informed in January of 2024 that FTS was no longer going to make interest payments on the amount still owed to Plaintiff. *Id.* at 22. Plaintiff contends that $8,832,924.67 is still owed to it under the Agreement. *Id.* at 27.

Thereafter, on January 29, 2024, Plaintiff filed a Complaint in the Court of Common Pleas for Bamberg County, South Carolina against FTS, BERI, FTRM, Platinum Equity Advisors, LLC, Eaton, Boruff, Lobetti III, and Ford. In that Complaint, Plaintiff alleged that all Defendants were involved in a scheme to divert and wrongfully withhold nearly nine million dollars owed to Plaintiff under a Product Buy-Sell Agreement. (ECF No. 1-1, p. 20). Plaintiff also sought and was granted an *ex parte* Temporary Restraining Order preventing Defendants FTS, BERI, and FTRM from "withdrawing and transferring certain moneys from their bank accounts." (ECF No. 1-1, p. 12). On March 7, 2024, Defendant Lobetti filed a Notice of Removal with this Court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446. (ECF No. 1). Plaintiff then filed its Amended Complaint (ECF No. 27), which contains sixteen causes of action—breach of contract as to FTS, breach of contract as to BERI, alter ego/amalgamation/piercing the corporate veil, breach of contract accompanied by a fraudulent act, breach of fiduciary duty, fraud/misrepresentation, constructive fraud, violation of the South Carolina Unfair Trade Practices Act, negligent misrepresentation, aiding and abetting a breach of fiduciary duty, breach of fiduciary duties to creditor/trust fund doctrine, civil conspiracy, conversion, constructive trust, quantum meruit/unjust enrichment, and tortious interference with contract—pursuant to which the present motions have been brought. (ECF Nos. 36, 37).

4

## II.    LEGAL STANDARD

### A. FRCP 12(b)(6)

A complaint may be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Rule 8 of the FRCP, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Atlantic Corp. v. Twombly*, 550 U.S. 544, 580 (2007).

In reviewing the adequacy of a complaint, a court "should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The reviewing court need only accept as true the complaint's factual allegations, not its legal conclusions. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. According to the U.S. Court of Appeals for the Fourth Circuit, "a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs.*, 7 F.3d at 1134.

### B. FRCP 12(b)(2)

When a defendant challenges personal jurisdiction, the plaintiff has the burden of showing that such jurisdiction exists. *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). When the court decides a personal jurisdiction challenge without an evidentiary hearing, the plaintiff must prove a prima facie case of personal jurisdiction. *See Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). "In considering the challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the

5

most favorable inferences for the existence of jurisdiction." *In re Celotex Corp.*, 234 F.3d at 628 (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). However, the court need not "credit conclusory allegations or draw farfetched inferences." *Masselli & Lane, PC v. Miller & Schuh, PA*, 215 F.3d 1320 (4th Cir. 2000).

In ruling on a motion to dismiss for lack of personal jurisdiction, the court may consider evidence outside of the pleadings, such as affidavits and other evidentiary materials, without converting the motion to one for summary judgment. *Magic Toyota, Inc. v. Se. Toyota Distributors, Inc.,* 784 F.Supp. 306, 310 (D.S.C. 1992). The plaintiff's showing must be based on "specific facts set forth in the record." *Id.*

In determining whether a prima facie showing has been made, the court may consider the uncontroverted allegations in the plaintiff's complaint. *Wolf v. Richmond Cnty. Hosp. Auth.,* 745 F.2d 904, 908 (4th Cir.1984). However, whenever a defendant's sworn affidavit contests the allegations in the complaint, the plaintiff can no longer rest on those allegations. *See id.* Instead, the plaintiff bears the burden to present an affidavit or other evidence showing jurisdiction exists over the nonresident defendant. *See id.*; *Clark v. Remark,* 993 F.2d 228, 1993 WL 134616, at *2 (4th Cir.1993) (unpublished table decision).

## III.     ANALYSIS

### A.  Defendant Eaton's Motion to Dismiss for Failure to State a Claim

#### 1.  The Fraudulent Claims

Defendant Eaton first alleges that Plaintiff's claims for Breach of Contract accompanied by a Fraudulent Act; Fraud and Misrepresentation; Constructive Fraud; and Negligent Misrepresentation (the "Fraudulent Claims") fail to state a claim because the allegedly withheld financial information in question was "publicly available." (ECF No. 37, p. 4). Additionally, Eaton

6

argues that the delinquent invoices Plaintiff discusses did not accrue until after Eaton's resignation. *Id.* Lastly, Eaton argues that Plaintiff makes no specific allegations regarding his alleged involvement in requests for extensions on payments due to Plaintiff under the Buy-Sell Agreement. *Id.* Plaintiff counters that Eaton cannot rely upon mere reference to business records without explanation, the accuracy of which is unknown and unclear, especially records belonging to BERI, as opposed to FTS, the business entity that was obligated to repay Defendant directly under the Buy-Sell agreement. (ECF No. 43, pp. 1, 4–5). Plaintiff further argues that the nature of its business relationship with Eaton was not a mere arm's length relationship, obligating Eaton to accurately depict FTS's financial condition. (ECF No. 43, pp. 5-6). Lastly, Plaintiff argues that Eaton's resignation does not negate the role he played in diverting funds and other alleged fraudulent conduct "at the inception of the Buy-Sell Agreement" as well as "direct[ing] the fraudulent extension requests" that Plaintiff alleges. (ECF No. 43, pp. 6–7).

First and foremost, this Court will not hold that Plaintiffs' Fraudulent Claims fail as a matter of law simply because certain financial statements were available on the internet at the time that the parties were negotiating the Agreement at issue. Plaintiff rightly points out that certain aspects of BERI's financial condition would likely not have been reflected in its financial statements in late 2022 while the Agreement was being negotiated, since "BERI had just acquired FTS and FTRM in September 2022." (ECF No. 43, p. 4–5). Further, the Court will not assume the accuracy of BERI's financial statements at this stage of the litigation, particularly when Eaton has not explained what BERI's records demonstrate or which portions of the records should have indicated BERI's failing financial condition. Additionally, and notably, Eaton has not provided information as to FTS's financial condition at the time the Agreement was being negotiated, which is no less important than BERI's financial condition in light of Plaintiff's allegations. Construing

Plaintiff's allegations in the light most favorable to it, the Court will not infer that FTS or BERI were in an obviously untenable financial position based on unexplained financial statements, the accuracy and completeness of which is not presently clear.

Further, South Carolina law states that: "[T]o determine whether a fiduciary relationship existed, [courts] must look to the particulars of the relationship between the parties." *Armstrong v. Collins*, 366 S.C. 204, 222, 621 S.E.2d 368, 377 (Ct. App. 2005) (citation omitted). Defendant Eaton insists that the relationship between himself and Plaintiff was non-fiduciary and that the transaction in question was an arm's length transaction. However, Plaintiff has alleged otherwise, and the applicable law counsels that there is no bright line rule as to what constitutes a fiduciary relationship or an arm's length transaction. Such inquiries are inherently driven by the facts of the case. *See Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 330, 574 S.E.2d 502, 507 (Ct. App. 2002) (quoting *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct. App. 1987)) (stating that courts "have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring").

In this case, Plaintiff's allegations describe a relationship with Eaton that could conceivably be a fiduciary one and that may have involved reasonable reliance. *See Jacobson v. Yaschik*, 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967) (stating that a fiduciary relationship may exist when "one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other . . ."); *see also  Thomas v. Am. Workmen*, 197 S.C. 178, 178, 14 S.E.2d 886, 888 (1941) ("Whether or not reliance upon a representation in a particular case is

8

justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties."). For instance, Plaintiff notes that the parties had worked together closely since 2012, that Eaton represented to Plaintiff that he was working to ensure that the Agreement was structured to Plaintiff's benefit, and that he was the driving force behind the formation of the Agreement. (ECF No. 43, pp. 7–9).

At this stage of the litigation, this Court in ruling on a Motion to Dismiss may only look to the allegations contained within the Plaintiff's Complaint. Plaintiff has alleged that it relied upon Eaton's representations, that it did so reasonably, and that Eaton induced its reliance, in addition to other allegations regarding the lengthy and close nature of the parties' business relationship. Those allegations satisfy the standard this Court must apply in ruling on a Motion to Dismiss because they present a "set of facts" that "would support [Plaintiff's] claim and would entitle it to relief." *Est. of Valentine v. South Carolina,* 611 F. Supp. 3d 99, 111 (D.S.C. 2019). Any factual disputes are premature at this time. Thus, this Court will not find that Plaintiff's and Eaton's relationship was not fiduciary or that Plaintiff's reliance was unreasonable at this stage of the litigation.[6]

Further, although the parties agree that Eaton departed FTS in September of 2023, Eaton contends that Plaintiff's allegations that Eaton remained involved in "influenc[ing] or direct[ing]

---

[6] For the same reasons, this Court will construe Plaintiff's allegations regarding the nature of the transaction in question in the light most favorable to Plaintiff and will not hold that the transaction was an "arm's length" transaction for purposes of this motion.

conveyances of company assets" are "nonsensical." (ECF No. 37, p. 6). Merely suggesting that something is "nonsensical" or "unlikely" does not mean that Plaintiff has failed to state a claim. Plaintiff has clearly alleged that Eaton was involved in decision-making that deprived Plaintiff of money owed to it under the Agreement both before and after Eaton formally left his position as COO of BERI. (ECF No. 27, pp. 17, 29–33). The lack of specific evidence to support this allegation at this stage of the litigation is not fatal. Plaintiff will obviously be required to support these allegations with evidence in order to ultimately prevail, and the potential lack of any evidence on Plaintiff's part can also be tested on a motion for summary judgment. However, on a motion to dismiss, this Court is constrained to evaluate the allegations in Plaintiff's complaint. Plaintiff has alleged that Eaton played a role in the actions underlying the Fraudulent Claims even after his departure, and, thus, Plaintiff has stated a claim for which relief can be granted.

Finally, with respect to Plaintiff's claim for breach of contract accompanied by a fraudulent act, Eaton contends that this claim must fail as to Eaton because he was not individually a party to the Agreement. (ECF No. 37, p. 8). A claim for breach of contract accompanied by fraudulent act requires that there be a breach of contract, which in turn requires that the one alleged to have breached the contract be a party to that contract. *See Trancik v. USAA Inc. Co.*, 354 S.C. 549, 553–54, 581 S.E.2d 858, 861 (Ct. App. 2003) (stating that "an individual who is not a party to a contract generally cannot be liable for its breach"). Although Eaton signed the Agreement, he did so in his capacity as then-President of FTS. (ECF No. 27-2, p. 6). For an agent of an entity to be personally liable on a contract entered into by that entity, the agent must act "without authority." *See Skinner & Ruddock, Inc. v. London Guarantee & Acc. Co.*, 239 S.C. 614, 619, 124 S.E.2d 178, 180 (1962). Plaintiff has not alleged that Eaton acted outside of his authority as President of FTS in signing the Agreement, nor has it alleged that Eaton is somehow otherwise individually a party to the

contract.[7] Thus, Plaintiff has not stated a claim against Eaton for breach of contract accompanied by a fraudulent act because it has not alleged that he is a party to the contract in his individual capacity, rather than simply in his capacity as an agent of FTS. This Court therefore grants Eaton's Motion to Dismiss as to this claim.

### 2. Breach of Fiduciary Duty Claim

Defendant Eaton argues that Plaintiff's claim for Breach of Fiduciary Duty should be dismissed because there can be no fiduciary duty owed between a lender and a borrower or between an officer or director and a non-shareholder. (ECF No. 37, pp. 7–8). Eaton further argues that he was not individually a party to the Agreement, and any reliance on Plaintiff's part was purely unilateral. Plaintiff counters that the parties' relationship was not a mere lender-borrower relationship, extending across many years and multiple business entities. (ECF No. 43, pp. 8–9). Plaintiff further contends that Eaton represented that he was acting in Plaintiff's interests and specifically sought to induce Plaintiff's trust as the Agreement was being negotiated. For the same reasons stated above, Plaintiff's allegations, taken as true, describe a relationship that is fiduciary in nature. *See Regions Bank v. Schmauch*, 354 S.C. 648, 582 S.E.2d 432 (Ct. App. 2003) (stating that a fiduciary relationship requires that "[t]he other party must have actually accepted or induced the confidence placed in him"). Further, even if this relationship were like that of a bank and its customer, Plaintiff has alleged that Eaton advised it regarding the most beneficial way to structure the Agreement in the course of the parties' negotiations, rendering the relationship fiduciary even in that instance. *Id.* at 671. (stating that "[a] bank may be held to a fiduciary duty if it undertakes

---

[7] Plaintiff does not address whether Eaton acted within the scope of his authority as FTS's agent with respect to his signing of the Agreement in its complaint. In fact, Plaintiff alleges specifically that: "Brabham, FTS, and BERI entered into a new Product Buy-Sell Agreement effective January 1, 2023 . . . ." (ECF No. 27, p. 12). Plaintiff alleges that Eaton was heavily involved in negotiating the Agreement and bringing it to fruition, but it does not allege that Eaton lacked authority as FTS's agent in doing so. (ECF No. 27, pp. 9–15).

to advise a depositor as part of services the bank offers"); *see also* (ECF No. 27-13; ECF No. 43, pp. 8–9). Ultimately, for the reasons stated in this section and in Section III.A.1., the allegations in Plaintiff's complaint suffice to clear the hurdle presented by a Motion to Dismiss with respect to whether Eaton owed and breached a fiduciary duty to Plaintiff.

### 3. Aiding and Abetting Breach of Fiduciary Duty Claim

Eaton next contends that Plaintiff's claim for Aiding and Abetting a Breach of Fiduciary Duty should be dismissed because there was no fiduciary duty between Plaintiff and FTS or BERI and because Eaton did not knowingly aid either entity in any alleged breach. (ECF No. 37, pp. 8–9). First, Plaintiff rightly points out that it has alleged that Eaton aided and abetted the other individual Defendants—Lobetti, Ford, and Boruff—in their breach of their alleged fiduciary duties. (ECF No. 43, p. 9). Thus, even in the absence of a fiduciary duty owed by BERI or FTS, Eaton's motion can be denied. However, Plaintiff has alleged that all Defendants, including FTS and BERI, owed it a fiduciary duty that each Defendant breached. Plaintiff's allegations on this point are sufficient to survive a Motion to Dismiss for the reasons addressed in Sections III.A.1–2.

Further, Plaintiff correctly contends that it has alleged that Eaton knowingly participated in the other Defendant's breach of their fiduciary duty owed to Plaintiff.  (ECF No. 43, p. 10). Specifically, Plaintiff has alleged that Eaton "possessed Settled Funds" instead of paying Plaintiff as required under the Agreement; participated in making decisions to divert Settled Funds away from Plaintiff; and that Eaton knew or should have known that FTS was in failing financial condition. (ECF No. 43, p. 10). Thus, Plaintiff has alleged both that Eaton aided and abetted multiple Defendants in breaching a fiduciary duty owed to Plaintiff, and that he did so knowingly.

*See Vortex Sports & Entm't, Inc. v. Ware*, 378 S.C. 197, 204, 662 S.E.2d 444, 448 (Ct. App. 2008). Eaton's Motion to Dismiss this claim is therefore denied.

### 4. Breach of Fiduciary Duty Owed to Creditor – Trust Fund Doctrine

Eaton next argues that Plaintiff's "Breach of Fiduciary Duty owed to Creditor – Trust Fund Doctrine" claim should be dismissed for three reasons: (1) Plaintiff has not pled facts showing that Eaton owed a fiduciary duty to Plaintiff under Utah's and Texas's laws; (2) Plaintiff lacks standing to bring this claim; and (3) Plaintiff has not shown that BERI or FTS are insolvent and have ceased doing business, or that Eaton knew either was insolvent and violated a duty owed to Plaintiff as a result. (ECF No. 27, p. 10). Eaton argues that South Carolina's internal affairs doctrine means that "the laws of the state of incorporation" should apply to Plaintiff's Trust Fund Doctrine claim. *See Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640, 649–50 (2018) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645) (stating that South Carolina is "not authorized to regulate the organization or internal affairs of a foreign corporation"). Plaintiff appears to agree, as it responds to this portion of Eaton's Motion to Dismiss assuming that Texas and Utah law should apply to its claims against FTS and BERI respectively.[8]

Under Utah law, Plaintiff argues that its Breach of Fiduciary Duty Owed to Creditor claim against BERI—however it is labeled—should survive Eaton's motion because Utah law permits creditors to directly sue corporate insiders when a contract between the corporation and the creditor is at issue. (ECF No. 43, p. 11). Plaintiff further argues that it has stated a claim against FTS under

---

[8] This Court is not convinced that the choice of law question is as straightforward as the parties seem to believe. South Carolina has not specifically held that the internal affairs doctrine applies in cases involving relationships between directors and third-party creditors. The *Pertuis* case relied on by Eaton discussed a piercing the corporate veil claim brought by a former managing partner, and the *Pertuis* court held that the internal affairs doctrine did not apply in that case because it involved "disputes that reach[ed] beyond the confines of the corporation." *Pertuis*, 423 S.C. at 650. It is possible that the involvement of a third-party creditor—one that is not a director, shareholder, or officer—could place Plaintiff's Trust Fund Doctrine claim in the category of claims that "reach beyond the confines of the corporation." *Id.* However, for purposes of this motion, the Court will proceed in light of the parties' agreement that the internal affairs doctrine applies to this claim, and that Utah and Texas law should therefore be applied.

Texas law because it has properly alleged that FTS was insolvent at the time the parties were negotiating the Agreement and that its continued operations despite its insolvency show that it had ceased to operate in good faith. *Id.* at 12. This Court will first address the standing issue under Texas law, and then it will address whether Plaintiff has properly stated a claim against either entity under the applicable state's law.

## A. Trust Fund Doctrine Claim against FTS – Texas Law

The cases Eaton cites do not clearly stand for the proposition that Plaintiff can only bring a claim for a breach of fiduciary duty against it under the trust fund doctrine if it does so in a derivative action. The first case Eaton refers to—*Aurelius Capital Master, Ltd. v. Acosta*—merely states that a "creditor may bring derivative suits under limited circumstances" but does not state that creditors may not bring direct suits under the trust fund doctrine. No. 3:13-CV-1173-P, 2014 WL 10505127, at *2 (N.D. Tex. Jan. 28, 2014) (stating that there is "ambiguity [as to] whether the trust fund doctrine creates a fiduciary duty to the creditors or enables them to sue derivatively"). If anything, the case cited to appears to assume without stating explicitly that a creditor could bring a direct action against a director under the trust fund doctrine. *Id.* The remainder of the cases cited by Eaton are not cases from Texas or the Fifth Circuit, and they do not apply or discuss relevant Texas law.[9] Texas law appears to be unsettled on this point, and federal courts seeking to apply Texas law have not found consensus either. However, there is support for the argument that Texas would permit a direct action brought by a third-party creditor under the trust fund doctrine.[10] *See*

---

[9] The other case referenced by Plaintiff, *Ramirez Capital Services, LLC v. McMahan*, is far from clear. It both states that "the trust fund doctrine is a mechanism, in Texas law, to recognize a creditor's right to sue derivatively" and that an action brought under the trust fund doctrine can "be prosecuted directly by the creditors." No. 4:21-CV-00241-ALM, 2021 WL 5907791, at *5 (E.D. Tex. Dec. 14, 2021).

[10] This Court is concerned about the effect of the award of 500,000 shares of BERI stock to McCully Development Group, LLC under the Agreement on Plaintiff's status as a third-party creditor. (ECF No. 27, p. 13). The parties have not addressed whether that stock award renders Plaintiff a shareholder of BERI, and whether or how that may affect the arguments being raised regarding the applicability of the internal affairs doctrine. The parties are advised to consider these issues in future briefing and future dispositive motions before the Court.

*Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 628–29 (Tex. Civ. App. 1973) (stating that the duties of care and loyalty owed by officers and directors of a corporation can ordinarily only be enforced by shareholders or one "standing in the position of the corporation for the benefit of a creditor," but that the "trust fund doctrine" permits creditors to bring actions "directly").

Having established that there is no issue of standing under Texas law at this juncture, and that Texas law does not explicitly prohibit direct suits under the trust fund doctrine by creditors, this Court will address whether Plaintiff has properly alleged that FTS is insolvent and that it has either ceased to do business or that it is no longer doing business in good faith. *See Akanse v. Fatjo*, 130 F.3d 657, 671–72 (5th Cir. 1997). Plaintiff contends that it does not have to allege that FTS or BERI have ceased doing business so long as it alleges that they have ceased doing business in good faith. Fifth Circuit authority that interprets Texas law has held precisely this. *Id.* (stating that a plaintiff bringing suit under the trust fund doctrine "may still succeed if [it] can show that the corporation has ceased doing business in good faith"). Thus, despite other federal courts' holdings to the contrary, Texas law appears to permit a plaintiff to maintain a suit under the trust fund doctrine even if a plaintiff does not explicitly allege that a corporation has ceased doing business, so long as that plaintiff alleges that a corporation has "ceased doing business in good faith." *See Fagan*, 494 S.W.2d at 631.

Plaintiff is bringing a direct suit, which Texas law seemingly permits. It further alleges that FTS was insolvent; that BERI "wrote off the value of the Intangible Assets of FTS" in August of 2023; and that "liquidation [of FTS was] imminent." (ECF No. 43, p. 12). These factual allegations are sufficient to allege insolvency under Texas Law. *See Fagan*, 130 F.3d at 629 (stating that "when a corporation's assets are insufficient for the payment of its debts, and it has ceased to do business, or has taken, or is in the act of taking, a step which will practically incapacitate it for

conducting the corporate enterprise with reasonable prospect of success, or its embarrassments are such that early suspension and failure must ensue, then such corporation must be pronounced insolvent"). Plaintiff has thus alleged facts sufficient to survive a Motion to Dismiss that FTS had ceased operating in good faith, and further that Eaton knew or should have known of these things. (ECF No. 43, p. 12).

## B. Breach of Fiduciary Duty Claim against BERI – Utah Law

Eaton contends that Plaintiff cannot state a claim against him under Utah law under the trust fund doctrine. Specifically, Eaton states that the cases cited to by Plaintiff merely stand for the proposition that a director can be sued for his or her own torts, not that a corporation can be sued for a director's alleged breach of fiduciary duty. (ECF No. 47, p. 6). On the one hand, Utah law does not recognize the "trust fund" doctrine. *Passow & Sons v. Wetherbee*, 167 P. 350, 351–52 (1917); *see also Asphalt Trader Ltd. v. Beall*, No. 1:17-CV-15-DB, 2018 WL 11450168, at *3 (D. Utah July 30, 2018). However, Utah courts have held, albeit in the context of a bankruptcy proceeding, that principles governing a bankruptcy trustee's "right to bring an action for corporate mismanagement against directors or officers of the debtor corporation for the benefit" of all the estate's creditors "[does] not preclude actions against corporate insiders by creditors who have been specifically harmed by their wrongful conduct." *ANR Ltd. Inc. v. Chattin*, 89 B.R. 898, 901–02 (D. Utah 1988). Utah's Supreme Court has specifically stated that "claims of a creditor that stem[] from a particular contract between the creditor and the corporation" are the sort of "direct" claims that creditors may bring without being precluded by the rule that "a corporation is [typically] the proper party to assert claims against its insiders for . . . breach of fiduciary duty to the corporation." *Warner v. DMG Color, Inc.*, 20 P.3d 868, 872 (2000). Lastly, Utah's Supreme Court has further implied that directors or officers of a corporation can be liable to the

16

corporation's creditors where there is "privity between the parties," a "contractual relation between them," or some "other legal relation which would raise a duty . . . to the creditor to exercise care in the management of the affairs of the corporation." *Equitable Life & Cas. Ins. Co. v. Inland Printing Co.*, 26 Utah 2d. 19, 21 (1971).[11]

To the extent that Plaintiff's allegations laid out in its eleventh cause of action allege a general breach of fiduciary duty relating to the Agreement entered into between Plaintiff and Defendants, Utah law permits such claims.[12] This Court would note that Plaintiff has separately, and perhaps repetitively, stated a claim for "Breach of Fiduciary Duty" as to all Defendants, currently labeled as Plaintiff's fifth cause of action. (ECF No. 27, pp. 29–30). However, the Court will deny Eaton's motion to dismiss Plaintiff's eleventh cause of action as it relates to Eaton's role at BERI at this time, in light of Plaintiff's characterization of its eleventh cause of action as a breach of fiduciary duty claim, not a trust fund doctrine claim. At some point during this litigation, Plaintiff may be asked to offer greater specificity regarding the remedies it seeks with respect to this cause of action against BERI in light of the fact that it is prohibited under Utah law from bringing a specific trust fund claim as to BERI. As noted in the *Asphalt Trader* case, a claim "based upon the trust fund doctrine claim is a claim for breach of a fiduciary duty." 2018 WL 11450168, at *3. When the "trust fund" label is stripped away, allegations that: (1) a fiduciary duty was owed; (2) that it was breached; and (3) that the plaintiff has been harmed can still state a claim under Utah law. Here, Plaintiff has alleged all three. Eaton's motion to dismiss this claim—which the

---

[11] Eaton argues that corporate directors can only "be sued by a creditor for [their] own torts including theft, conversion, and misrepresentation." (ECF No. 47, p. 6). On the contrary, as explained above, Utah law specifically states that at least some direct claims can be brought by creditors alleging breaches of fiduciary duty, especially relating to contracts between directors and creditors.

[12] Plaintiff seemingly re-characterizes its eleventh cause of action as to BERI as one alleging "breach of fiduciary duty owed to it as a creditor." (ECF No. 43, p. 11).

Court now characterizes as alleging a breach of fiduciary duty owed to Plaintiff as Defendants' creditor—is denied.

### 5. Civil Conspiracy

Eaton argues that Plaintiff's Civil Conspiracy claim should be dismissed because Plaintiff has not "set forth independent overt acts in furtherance of the conspiracy" and has "merely reallege[d] the underlying misconduct and resulting harm asserted in its other claims." (ECF No. 37, p. 13). Eaton further argues that Plaintiff has not pled the requisite "intent to harm" required under South Carolina law governing civil conspiracy claims. (ECF No. 37, p. 14).

Plaintiff has sufficiently alleged the requisite intent to state a claim for civil conspiracy. First, Plaintiff has alleged within its twelfth cause of action that Defendants' overt actions were "intentional" and that all Defendants sought to "benefit themselves over Plaintiff." (ECF No. 27, p. 36). Further, Plaintiff has alleged other facts throughout its complaint that indicate Eaton's and Defendants' intent to harm, including the following: FTS's requests for payment deadline extensions made at the time that Defendants knew or should have known of its failing financial condition (ECF No. 27, pp. 17–18); diversion of funds away from FTS "for unauthorized purposes" (ECF No. 27, p. 18); and refusal to pay the proceeds from the liquidation of Rack Fuel Inventories to Brabham as promised (ECF No. 27, pp. 21–22). All of these facts, taken in the light most favorable to the Plaintiff, indicate an intent to harm Brabham by painting an intentionally misleading picture of Defendants' financial condition and by breaking numerous promises to make payment and instead diverting the promised funds elsewhere. *See Paradis v. Charleston Cnty. Sch. Dist.*, 433 S.C. 562, 574, 861 S.E.2d 774, 780 (2021) (stating that "intent to harm . . . [is] an inherent part of the analysis").

Further, Plaintiff has alleged a sufficiently separate overt act in its Civil Conspiracy claim to survive a motion to dismiss. Plaintiff's other causes of action occasionally reference Rack Fuel Inventories, but they do so only to allege that Defendants misrepresented their plans with respect to Rack Fuel Inventories. (ECF No. 27, pp. 30–33). Plaintiff's civil conspiracy claim additionally alleges that Defendants "divert[ed] monies received from the liquidation of Rack Fuel Inventories" despite having represented that they would pay Plaintiff the proceeds of the liquidation. (ECF No. 27, p. 36). This is a separate act sufficient to state a claim for civil conspiracy. *See Landon v. Vaden of Beaufort, Inc.*, No. 9:23-CV-01956-RMG-MHC, 2023 WL 8703569 (D.S.C. Nov. 30, 2023), *report and recommendation adopted sub nom.*, *Landon v. Vanden of Beaufort, Inc.*, No. 9:23-CV-1956-RMG, 2023 WL 8702742 (D.S.C. Dec. 15, 2023) (stating that a Plaintiff must "plead additional facts in furtherance of the conspiracy separate and independent from other wrongful acts alleged in the complaint") (cleaned up). Thus, Eaton's motion to dismiss the Civil Conspiracy claim is denied.

### 6. The SCUTPA Claim

Eaton argues that Plaintiff has not alleged facts showing that the acts in question "have an impact on the public interest." (ECF No. 37, p. 14). Eaton also contends that Plaintiff has not demonstrated that the alleged conduct might occur again in the future, since Eaton is no longer employed by any of the corporate Defendants. *Id.* Plaintiff counters that, because Eaton's acts could be repeated since he still works in this industry, they have an impact on the public interest. (ECF No. 43, p. 15). Plaintiff further asserts that Defendants' acts have already affected more entities than just Plaintiff and are likely to be repeated if Defendants are not deterred. *Id.*

The parties' dispute as to this claim primarily centers around whether Plaintiff has shown that Defendant's alleged conduct had "[a]n impact on the public interest," one of the three required

19

elements of an SCUTPA claim. *See Turner v. Kellett*, 426 S.C. 42, 47–48, 824 S.E.2d 466, 469 (Ct. App. 2019). In order to satisfy that element, Plaintiff can show either that "the same kind of actions occurred in the past" or that "the company's procedures create a potential for repetition of the unfair and deceptive acts." *Id.* at 49, 824 S.E.2d at 469. Further, "each case must be evaluated on its own merits to determine what a plaintiff must show to satisfy [this] prong of the [Act]." *Id.* Plaintiff does not allege facts that could show that "the same kind of actions occurred in the past."[13] *Id.* at 48, 824 S.E.2d at 469. Thus, Plaintiff must allege facts that could "show[] the company's procedures create a potential for repetition of the unfair and deceptive acts." *Id.* Further, and importantly, "conduct which only affects the parties to the transaction provides no basis for a UTPA claim." *Jefferies v. Phillips*, 316 S.C. 523, 527, 451 S.E.2d 21, 23 (Ct. App. 1994).

Plaintiff first alleges that the fact that payments were made to Brabham using money from "other entities and/or investors" shows that those entities were harmed and therefore the public was harmed. (ECF No. 27, p. 33). These non-specific allegations of unspecified impact on third parties do not satisfy the requirement that the unfair or deceptive acts have affected the public interest. *See Carolina Cargo, Inc. v. Transportation Pers. Servs., Inc.*, No. 0:15-CV-04629-JMC, 2016 WL 4506071, at *4 (D.S.C. Aug. 29, 2016) (stating that "a plaintiff must use specific facts to show that members of the public were or were likely to be affected"). Further, Plaintiff has not shown that the "the company's procedures create a potential for repetition of the unfair and deceptive acts." *Turner* at 48–49, 824 S.E.2d at 469. Courts certainly have discretion to examine

---

[13] With respect to Defendants' past conduct, Plaintiff only alleges that Defendants' wrongful acts "have occurred in the past in this Agreement with Brabham." (ECF No. 27, pp. 32–33). Plaintiff argues that it has alleged that "Defendants' unfair and deceptive acts and practices affect much more than just Brabham." (ECF No. 43, p. 15). However, Plaintiff has not alleged that Defendants undertook "the same kind of actions in *the past*," at a time prior to or involving transactions separate from those at issue in Plaintiff's complaint. *Turner*, 426 S.C. at 48, 824 S.E.2d at 469 (emphasis added); *see also Wright v. Craft*, 372 S.C. 1, 31–32, 640 S.E.2d 486, 502–03 (Ct. App. 2006) (stating that "the record is replete with evidence indicating [Defendant] has previously engaged in and would continue to engage in the same business practices and procedures that affected his transactions with Wright").

the facts of a particular case to determine whether there is potential for repetition of the alleged wrongful acts. However, courts have also generally only found potential for repetition where the wrongful acts were related to a company policy or training that therefore had a heightened likelihood of affecting others. *See Singleton v. Stokes Motors, Inc.*, 358 S.C. 369, 381, 595 S.E.2d 461, 468 (2004) (holding that acts that are "standard business practice" such as delaying credit approval and "having customers sign [] an unconditional sales contract and a conditional bailment agreement" are capable of repetition); *see also Wright v. Craft*, 372 S.C. 1, 30–32, 640 S.E.2d 486, 502–03 (Ct. App. 2006) (holding that an admitted business practice of failure to disclose past wrecks or damage to a car being resold demonstrated "potential for repetition"). Further, courts have specifically held that merely continuing to "engag[e] in the same business" is not sufficient to demonstrate the possibility of repetition, as Plaintiff attempts to argue. *Jeffries* at 529, 451 S.E.2d at 24.

Ultimately, Plaintiff has not alleged facts that show that parties other than the parties to the transaction at issue have been affected by Eaton's actions. Because "[a]n unfair or deceptive act or practice that affects only the parties to a . . . commercial transaction is beyond the [SCUTPA's] embrace," Eaton's motion to dismiss this claim as to Eaton himself is granted. *Noack Enterprises, Inc. v. County Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 479, 351 S.E.2d 347, 349–50 (Ct. App. 1986).

### 7. The Tortious Interference with Contract Claim

Eaton argues that Plaintiff has not stated a claim against him for tortious interference with contract because Plaintiff has not alleged that Eaton acted outside the scope of his employment. (ECF No. 37, p. 15). Further, Eaton argues that Plaintiff's claim must fail because the breach of contract at issue occurred after Eaton resigned from the corporate defendants. *Id.* Plaintiff counters

that it has alleged that Eaton acted for "his own 'independent purpose'" when he "us[ed] money belonging to Brabham" in addition to other wrongful actions. (ECF No. 43 p. 17). Plaintiff further notes that it has alleged that Eaton caused "monies owed to Brabham [to be] diverted . . . since the inception of the Agreement," making the timing of his departure irrelevant to this claim. *Id.*

As an initial matter, "it is generally recognized that when a contract is breached by a corporation as the result of the inducement of an officer or agent of the corporation acting on behalf of the corporation and within the scope of his employment, the inducement is privileged and is not actionable." *Bradburn v. Colonial Stores, Inc.*, 273 S.C. 186, 188, 255 S.E.2d 453, 455 (1979). This privilege only applies "when the agent is acting within the scope of its authority." *Dutch Fork Dev. Grp. II, LLC v. SEL Properties, LLC*, 406 S.C. 596, 605, 753 S.E.2d 840, 843 (2012) (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 385 (3d Cir. 2004)). For instance, agents can be "personally liable for [a] corporation's contractual breaches [if they] assume[] personal liability, act[] in bad faith, or commit[] a tort in connection with the performance of the contract." *Id.* (quoting 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations*, Chapter 11, XXVIII, § 1117 (West 2012)). Ultimately, "if the servant acts for some independent purpose of his own, wholly disconnected with the furtherance of his master's business, his conduct falls outside the scope of his employment." *Crittenden v. Thompson-Walker Co., Inc*, 341 S.E.2d 385, 387 (S.C. Ct. App. 1986).

Plaintiff has alleged that Eaton took unauthorized actions that were for his own benefit and were taken in bad faith. (ECF No. 27, p. 39). Specifically, Plaintiff has alleged that Eaton either directly ordered or was aware of and benefitted from orders to divert funds owed to FTS and use those funds "for unauthorized purposes" that "benefitted" Eaton. *Id.* Plaintiff has further alleged that there was no legitimate business purpose for Eaton's interference with the parties' Agreement

22

and that his actions could not have been within the scope of his employment. (ECF No. 43, p. 17 (stating that "the Buy-Sell agreement specifically required payment of amounts received" to Plaintiff "first" before the monies could be used for other purposes)). Further, Plaintiff has argued that the alleged tortious interference has occurred "since the inception of the Agreement," negating Eaton's arguments regarding the timing of his resignation from the corporate defendants. (ECF No. 43, p. 17). Thus, Eaton's motion to dismiss this claim is denied.

**8.  The Conversion, Constructive Trust, and Quantum Meruit/Unjust Enrichment Claims**

Eaton lastly argues that Plaintiff's complaint requires this Court to improperly assume that Eaton was involved in the alleged diversion and misuse of monies owed to Plaintiff simply by virtue of his positions at BERI and FTS. Plaintiff counters that it has alleged that Eaton negotiated the Buy-Sell Agreement at issue and: (1) actively made misrepresentations in the course of doing so; (2) participated in and directed the diversion of money owed to Plaintiff from the time the Agreement was first formed; and (3) directly requested extensions to payment deadlines. (ECF No. 43, pp. 17–18).

At the Motion to Dismiss stage, Plaintiff has made sufficient allegations to support its claims that Eaton received an improper benefit through the diversion and use of funds paid by Plaintiff, that the funds have been converted by Defendants including Eaton, and/or that the funds should be held in constructive trust. (ECF No. 27, pp. 37–38). This Court is not being asked to make improper inferences about Eaton's knowledge simply by virtue of his former positions with the corporate defendants. Rather, Plaintiff has alleged that Eaton made knowing misrepresentations throughout the course of the parties' negotiation of the Agreement (ECF No. 27, pp. 9–12); that all Defendants including Eaton played a role in the diversion of funds owed to Plaintiff "since the inception of the Agreement" (ECF No. 27, pp. 2–3, 5); and that Defendants

23

have each benefitted personally as a result of their joint efforts to divert said funds. (ECF No. 27, pp. 37–38). The purpose of a 12(b)(6) motion is to "test[] the sufficiency of a complaint . . . . not [to] resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Disputes over whether Plaintiff has properly supported its allegations or provided evidence to show Eaton's involvement can be made on a Motion for Summary Judgment. However, resolving such disputes on a Motion to Dismiss would be improper and premature. Thus, Eaton's motion to dismiss the Conversion, Constructive Trust, and Quantum Meruit/Unjust Enrichment claims is denied.

## B. Defendants FTRM, Boruff, Lobetti, and Ford's Motion to Dismiss for Lack of Personal Jurisdiction

Each of the above-named Defendants seeks dismissal of Plaintiff's claims against them due to lack of personal jurisdiction. Each Defendant's claims will be addressed in turn.

In evaluating a challenge to personal jurisdiction under a state's long-arm statute, the court engages in a two-step analysis. *See Ellicott Mach. Corp. v. John Holland Party Ltd.,* 995 F.2d 474, 477 (4th Cir. 1993). First, the state's long-arm statute must authorize the exercise of jurisdiction under the facts presented. *Id.* Second, if the statute does authorize jurisdiction, the court must then determine if the statutory assertion of personal jurisdiction is consistent with due process. *Id.* South Carolina's long-arm statute has been interpreted to extend to the outer limits allowed by the Due Process Clause. *See Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). Thus, the only question before the court is whether the exercise of personal jurisdiction would violate due process. *See ESAB Grp., Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 328 (D.S.C. 1999).

The due process test for personal jurisdiction involves two components: minimum contacts and fairness. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980). Under the minimum contacts test, a nonresident defendant must have certain minimum contacts such that the

24

suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945). Due process is satisfied if the court asserts personal jurisdiction over a defendant who "purposefully avails itself of the privilege of conducting activities within the forum state," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen*, 444 U.S. at 297. After a showing of the defendant's purposeful availment, the reasonableness inquiry balances any burden on the defendant against countervailing concerns such as the plaintiff's interest in obtaining relief and the forum state's interest in the controversy. *See id.* at 292.

A party may be subject to the court's power either through general personal jurisdiction or specific personal jurisdiction. A court has general personal jurisdiction over a foreign corporation when its contacts within the forum state "are so continuous and systematic as to render them essentially at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotes omitted). Specific personal jurisdiction arises when a cause of action is related to the defendant's activities within the forum state. *See* S.C. Code Ann. § 36-2-803; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Plaintiff "does not contend this Court has general jurisdiction over Defendants." (ECF No. 40, p. 5). Accordingly, the Court will focus solely on the exercise of specific personal jurisdiction.

The Fourth Circuit has established a three-part test[14] for evaluating the propriety of exercising specific jurisdiction: (1) whether and to what extent the defendant purposely availed itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claims arise out of those forum-related activities;

---

[14] Commonly referred to as the *Consulting Eng'rs Corp* Test. *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215–216 (4th Cir. 2001) (citing *Helicopteros*, 466 U.S. at 414–16; *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 476–77 (1985)).

In evaluating the first prong, the Fourth Circuit has relied on several nonexclusive factors to determine whether a defendant has purposefully availed itself of a forum in the context of a business relationship, including:

> whether the defendant maintains offices or agents in the forum state; whether the defendant owns property in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality and extent of the parties' communications about the business being transacted; and whether the performance of contractual duties was to occur within the forum.

*Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (citations omitted). "If, and only if, we find that the plaintiff has satisfied this first prong of the test for specific jurisdiction need we move on to a consideration of prongs two and three." *Id.* The second factor in the specific jurisdiction analysis—that the litigation results from alleged injuries that "arise out of or relate to" the defendants purposeful availment into the state in question—is an equally important element in the court's analysis of this case.

The *third prong* of the *Consulting Eng'rs Corp.* test—whether the exercise of personal jurisdiction would be constitutionally reasonable—essentially is a question of whether the defendant's minimum contacts with the forum state "are such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

26

### 1. Defendant FTRM

Defendant FTRM is "an affiliate of FTS that is [] 100% owned and controlled by BERI and operates collaboratively . . . with FTS." (ECF No. 27, p. 4). Defendant FTRM has filed an affidavit disputing Plaintiff's jurisdictional allegations, although its affidavit was executed before Plaintiff's Amended Complaint was filed. (ECF No. 36-2). Defendant FTRM contends that it is a foreign corporation that has never conducted business in South Carolina, owned real or personal property in South Carolina, nor had offices in South Carolina. *Id.* Notably, FTRM states that it has never conducted business in South Carolina without addressing or responding to any of the specific factual allegations Plaintiff has made to the contrary. Further, FTRM argues that Plaintiff's causes of action against it do not arise out of or relate to any activities Plaintiff alleges that it has taken in South Carolina. (ECF No. 36, p. 7). Because Defendant's sworn affidavit does not controvert the specific allegations in Plaintiff's complaint—namely that FTRM did extensive business in South Carolina over a number of years—the burden has not been shifted to Plaintiff to provide additional evidence to support its jurisdictional allegations. *See Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 835 (D.S.C. 2015) (stating that a defendant's affidavit must "contest[] the allegations in the complaint"); *see also Whitney Info. Network, Inc. v. Xcentric Ventures, Ltd. Liab. Co.*, 199 F. App'x 738, 742–43 (11th Cir. 2006) (providing that an affidavit contesting jurisdictional allegations only "shifts the burden back to the plaintiff . . . when the defendant's affidavit is legally sufficient to effect the shift").

Plaintiff has alleged sufficient facts to satisfy the first prong of the *Consulting Eng'rs Corp.* test established by the Fourth Circuit for evaluating specific personal jurisdiction. Plaintiff has alleged that FTRM has deliberately engaged in long-term business activities in South Carolina for many years, that FTRM had contractually agreed that South Carolina was a proper venue for

business disputes between itself and Plaintiff, and that FTRM reached into South Carolina to initiate business. (ECF No. 40, pp. 7–8; ECF No. 40-1, pp. 3–4). Plaintiff also alleges that, prior to the execution of the instant Agreement, Plaintiff received "10% of FTRM's net monthly profits above $100,000" as a condition of the prior Buy-Sell Agreement. (ECF No. 40, p. 9). These facts, taken together, indicate that FTRM purposely availed itself of the privilege of doing business in South Carolina in the context of its lengthy business relationship with Plaintiff, a South Carolina corporation.

Further, FTRM's contacts with South Carolina satisfy the second prong of the *Consulting Eng'rs* test, which requires that the plaintiff's claims arise out of or relate to the defendant's contacts with the forum state. *See Electric Buffalo, LLC v. Kuhmute, Inc.*, No. 2:21-CV-02764-DCN, 2021 WL 5597860, at \*5 (D.S.C. Nov. 30, 2021). Plaintiff will satisfy this requirement when the "activity in the forum state is the genesis of [the] dispute," or "if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." *Id.* Importantly, the Supreme Court's recent *Ford Motor Co.* decision instructs that the "arise out of or relate to" test "does not 'require proof of causation.'" *Id.* (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 529 U.S. 351, 362 (2021)). "Instead, the specific jurisdiction test is more expansive, supporting a court's exercise of jurisdiction over an out-of-state defendant where that defendant's in-state contacts 'relate to' the plaintiff's claim." *Id.* While the "arise out of or relate to" requirement has limits, it ultimately provides that "direct, meaningful connection between the defendant's forum-state contacts and the plaintiff's claim" will support a finding of personal jurisdiction. *Id.*

In this case, Plaintiff has alleged numerous facts which demonstrate that its claims arise out of or relate to FTRM's contacts with South Carolina. First, Plaintiff has stated a claim for "alter

ego/amalgamation/piercing the corporate veil," in which Plaintiff alleges that FTRM was a "façade for the operations of BERI" and that "FTS, FTRM, and BERI each used the other to induce Brabham to enter into the Agreement." (ECF No. 27, p. 27). Thus, Plaintiff alleges that the actions of BERI and FTS that were directed at South Carolina, which were many, should be attributed to FTRM. Further, even if it had not alleged that the corporate defendants should be treated as one for jurisdictional purposes, Plaintiff has alleged that FTRM played a significant role in inducing Plaintiff to enter the Agreement at issue. The fact that FTRM is not a party to the Agreement thus does not defeat Plaintiff's jurisdictional allegations, which certainly satisfy the "arise out of **or** relate to" requirement of prong two of the *Consulting Eng'rs* test.[15] *See Electric Buffalo, LLC*, at *5 (emphasis added). Plaintiff's claims involve the formation and breach of the Agreement, but they also include quasi-contract claims and other claims that arise out of or relate to FTRM's conduct that was directed at South Carolina. The alleged conduct from which Plaintiff's claims arise includes: FTRM doing business with Plaintiff for numerous years; FTRM helping to induce Plaintiff to enter the Agreement; and FTRM's involvement in iterations of the Agreement that included a profit-sharing provision with FTRM. (ECF No. 27-6; ECF No. 27 p. 27; ECF No. 40 pp. 9–10). Plaintiff's allegations, taken as true, support a finding that "substantial correspondence and collaboration between the parties" forms an important part of Plaintiff's claims. *Electric Buffalo, LLC*, at *5.

Plaintiff has also satisfied the third prong of the *Consulting Eng'rs* test, which ultimately requires that the defendant's minimum contacts with the state "are such that [it] should reasonably

---

[15] Further, it is of note that FTRM raised no such arguments in its initial Motion to Dismiss. Courts are free to disregard new arguments raised in a reply brief, and thus this argument need not be addressed to deny Defendant's motion. *See CPT Medical, Inc. v. 3M Co.*, No. 6:21-CV-00845-DCC, 2022 WL 18584205, at * 2 n.2 (D.S.C. June 6, 2022). The entirety of Plaintiff's argument in its initial Motion to Dismiss simply states that "FTRM—a foreign entities [sic] that has never done business in South Carolina—has not 'purposely availed' itself in South Carolina as required for this Court to exercise personal jurisdiction." (ECF No. 36, p. 8). Defendant's lengthy new arguments in its Reply, to the extent they are not addressed in this Order, are not timely made and will not be considered by this Court.

anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The factors this court must consider in evaluating the constitutional reasonableness of exercising personal jurisdiction over FTRM are: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp. v. Rudewicz*, 471 U.S. 462, 476–77 (1985). Although Plaintiff's decision to bring suit in South Carolina certainly imposes a burden on FTRM, it is not such a gravely unfair burden as to offend due process principles. Further, South Carolina has an interest in adjudicating disputes regarding corporations organized under its state's laws. Plaintiff itself has an interest in obtaining "convenient and effective relief" that is met because it is litigating in the state where it is incorporated. Lastly, the parties have raised no arguments to suggest that judicial efficiency is not served by litigating here, or that other states have social policies that weigh in favor of litigating elsewhere. The third factor of the *Consulting Eng'rs* test is thus satisfied.

All Plaintiff must do at this stage of the litigation is make a prima facie showing of personal jurisdiction. *See Mylan Labs, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). This Court, construing all inferences and factual disputes in the Plaintiff's favor, finds that Plaintiff has done so. Further, Plaintiff has satisfied all three factors of the *Consulting Eng'rs* test. Thus, FTRM's motion to dismiss for lack of personal jurisdiction is denied.

### 2. Defendant Lobetti

Defendant Lobetti argues that he did not participate in the transactions at issue between Plaintiff and FTS, as he was the CFO of BERI at all relevant times and did not assume

30

responsibility for day-to-day management of FTS until after Eaton departed in September of 2023. (ECF No. 36, p. 3). Further, Defendant Lobetti, along with Defendants Boruff and Ford, seeks to raise the fiduciary shield doctrine as a basis for why the individual Defendants are not subject to personal jurisdiction in this matter. (ECF No. 36, p. 9). However, *Doe 9 v. Varsity Brands, LLC* does not stand for the proposition that the individual Defendants in this case are not subject to this Court's personal jurisdiction because of the fiduciary shield doctrine. *Doe 9 v. Varsity Brands* does not say that "the acts of a corporate officer or employee taken in [their] corporate capacity" cannot "form the predicate for jurisdiction over [them] in [their] individual capacity" without qualification. 69 F. Supp. 3d 464, 490–91 (D.S.C. 2023). In fact, the sentence immediately following the sentence Defendants refer to says that "[t]he Fourth Circuit . . . has explicitly rejected such a broad application of the fiduciary shield doctrine." *Id.* Instead, the Fourth Circuit has held that a non-resident corporate agent can be "properly subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process." *Id.* So long as Plaintiff can make a "showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury," personal jurisdiction can exist over the non-resident corporate defendant. *Id.* (quoting *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052, 1055–56 (4th Cir. 1983)).

South Carolina's long-arm statute is co-extensive with due process. Thus, Plaintiff must show the aforementioned sort of direct involvement in order to establish that personal jurisdiction over these individual Defendants is proper. Plaintiff has alleged sufficient facts to satisfy this requirement for each individual Defendant. Plaintiff has contended both in its Amended Complaint (ECF No. 27) and in its Affidavit (ECF No. 40-1) that Lobetti, Boruff, and Ford each had "direct, personal involvement" in shaping the terms of the Agreement by: seeking extensions on payment

31

deadlines which they never intended to meet; improperly using monies owed to Plaintiff; diverting the Rack Fuel Inventories proceeds; and ultimately declining to make future payments to Plaintiff. (ECF No. 40, pp. 13–14). Thus, the fiduciary shield doctrine is not an obstacle to this Court's exercise of personal jurisdiction over Lobetti, Boruff, or Ford.

As explained above, where a defendant provides a sworn affidavit contesting the allegations in the complaint, the plaintiff then bears the burden of presenting either an affidavit or other evidence demonstrating that personal jurisdiction exists over that defendant. Defendant Lobetti has provided an affidavit in which he states that he "was not involved in the day-to-day management of [FTS], and [he] was never involved in procuring, managing, or executing the transactions between FTS and [Plaintiff] at issue in the Complaint." (ECF No. 36-3, p. 2). Plaintiff then responded with its own affidavit in which it contends that Defendant Lobetti participated in the negotiation and confirmation of the Agreement, that he "coordinated and confirmed the sale of 500,000 shares of BERI stock," that Lobetti was on numerous conference calls about the Defendant's non-payment, and that Lobetti participated in diverting funds from the sale of Rack Fuel Inventories away from Plaintiff and to BERI. (ECF No. 40-1, pp. 4–6). Plaintiff's affidavit thus contains "contradictory factual allegations with respect to personal jurisdiction" that this Court will accept as true. *See Wolf v. Richmond Cnty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984) (citing *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971)).

Applying the *Consulting Eng'rs* test to Lobetti, the Court finds that Plaintiff has alleged that Lobetti, in his individual capacity, engaged in significant business activities in the forum state by participating in negotiation of the Agreement, disbursing stock to Plaintiff as a condition of the Agreement, and corresponding with Plaintiff via email and phone about the non-payment of funds owed to Plaintiff and the now-defunct plan to liquidate Rack Fuel Inventories to pay Plaintiff.

32

(ECF No. 40, pp. 14–15). These allegations satisfy the first prong of the *Consulting Eng'rs* test, by showing that Lobetti purposefully availed himself of South Carolina in the context of a business relationship with Plaintiff. Because Plaintiff's allegations cover both the time frame prior to and after Eaton's departure from FTS, the fact that Lobetti was not responsible for day-to-day management of FTS until after Eaton's departure does not impact this Court's jurisdiction over him. (ECF No. 27, pp. 19–22).

Lobetti points to several cases in arguing that his contacts with South Carolina were non-existent, insignificant, or that they post-date the formation of the Agreement. First, Lobetti contends that *Consulting Eng'rs* stands for the proposition that his telephone and email contacts cannot create personal jurisdiction. Although telephone calls and emails are not always sufficient to create personal jurisdiction, they can be if a court finds that the "nature, quality, and quantity" of the contacts is significant enough. *Consulting Eng'rs*, 561 F.3d at 279 n.5. Plaintiff has provided six email exchanges between itself and Lobetti between September 2023 and January 2024, in addition to referencing four conference calls which Lobetti participated in or initiated. (ECF No. 40, p. 14). Although perhaps the email communications and conference calls alone would not be sufficient to create personal jurisdiction, the emails and calls are not the sole basis for this Court's ruling that personal jurisdiction exists. Rather, the electronic communications together with Plaintiff's allegations regarding Lobetti's disbursement of stock, his role in contract negotiations, and his role in the subsequent non-payment and diversion of funds collectively form the basis for this Court's jurisdiction over Lobetti. Thus, this Court does not rely on the electronic correspondence alone, as Lobetti suggests.

Second, Lobetti points to *Burger King* in arguing that the Plaintiff cannot unilaterally create personal jurisdiction over him in South Carolina. This Court certainly recognizes that *Burger King*

counsels that a contract with a resident plaintiff alone cannot create personal jurisdiction; the defendant's own purposeful conduct, including "prior negotiations, [] contemplated future consequences . . . the terms of the contract, and the parties' actual course of dealing" all must be considered. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 478–79 (1985). Here, the Court is not merely looking to the existence of a contract with a South Carolina corporation, but the allegations of prior negotiations and subsequent improper conduct directed at South Carolina by Lobetti himself as a whole.

Third, Lobetti argues that his presence as a carbon copied email recipient cannot create personal jurisdiction. This Court does not so hold. The total of Lobetti's correspondence with Plaintiff—which includes direct communications via email and phone, in addition to the emails on which he was carbon copied—have been considered in this Court's ruling.

Lastly, Lobetti argues that *Sheppard v. Jacksonville Marine Supply* demonstrates that personal jurisdiction cannot exist over him for negotiations and representations taken prior to his involvement. Plaintiff correctly notes that its allegations regarding Lobetti do not solely involve actions taken prior to Eaton's departure. (ECF No. 40, p. 15). Although Plaintiff makes allegations that Lobetti participated in the negotiation of the Agreement, Plaintiff also makes allegations regarding Lobetti's involvement both in non-payment of monies owed to it after Eaton's departure and in diverting the proceeds of Rack Fuel Inventories away from Plaintiff. *Id.* Thus, *Sheppard* is not a useful analogue for this case. *Sheppard* involved a vice president whom the plaintiff conceded had not participated in negotiation of the agreement at hand, whereas this case involves a CFO whom Plaintiff has alleged participated both in negotiations prior to the Agreement being formed and in subsequent breaches and misrepresentations relating to that Agreement. *See Sheppard v. Jacksonville Marine Supply, Inc.*, 877 F. Supp. 260, 267 (D.S.C. 1995).

Accordingly, Plaintiff also satisfies the second *Consulting Eng'rs* prong, which asks whether Plaintiff's claims arise out of or relate to Lobetti's contacts with South Carolina. Plaintiff's claims directly relate to Lobetti's alleged participation in negotiating the Agreement, breaching the Agreement, and the ultimate non-payment and diversion of various monies owed to Plaintiff. Finally, for the same reasons stated above, the third prong of the *Consulting Eng'rs* test—the requirement that the exercise of personal jurisdiction be constitutionally reasonable—is met. Lobetti's motion to dismiss is therefore denied.

### 3. Defendant Boruff

Defendant Boruff contends that he should not be subject to personal jurisdiction before this Court because his one visit to South Carolina alone is not sufficient to create personal jurisdiction. (ECF No. 36, p. 2). Boruff has submitted an affidavit contesting Plaintiff's jurisdictional allegations, and Plaintiff has responded in turn with an affidavit of its own. (ECF Nos. 36-3, 40-1). Plaintiff's affidavit suffices to provide "contradictory factual allegations with respect to personal jurisdiction." Plaintiff alleges, both in its Amended Complaint and in its affidavit, that Boruff did indeed play a role in negotiating the Agreement, requesting extensions of payment, and causing non-payment and diversion of monies owed to Plaintiff, which this Court accepts as true for purposes of this motion to dismiss. *See Wolf v. Richmond Cnty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984) (citing *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971)).

Although one in-person meeting alone is not always sufficient to create specific personal jurisdiction, Boruff downplays the significance of this meeting taken together with his other contacts with South Carolina. Courts have held that "physical presence in the forum . . . is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Boruff's visit to South Carolina was for the purpose of inducing Plaintiff to enter into the Agreement with BERI and FTS, and

35

Plaintiff has alleged that the meeting was a primary reason that it ultimately formed the Agreement with Defendants. (ECF No. 40, pp. 15–16). This meeting is thus highly relevant to this Court's analysis of personal jurisdiction over Boruff. Further, the meeting at issue here is far more integral to the parties' business relationship and Plaintiff's ultimate claims than the meeting in *Booze Pops* that Boruff refers to. The meeting which the *Booze Pops* court found to be insufficient to create personal jurisdiction was not alleged to be central to the formation of an agreement between the parties and was otherwise far more tangential to that plaintiff's claims than the meeting between Boruff and Plaintiff. *See Booze Pops LLC v. Feal Estate Flipz, Inc.*, No. 2:20-CV-691-RMG, 2020 WL 3420716, at *7 (D.S.C. June 21, 2020).

Additionally, this Court disagrees that the "lone meeting" was Boruff's only contact with South Carolina. Plaintiff has alleged that Boruff communicated with it via phone and email over the course of the parties' relationship, that he participated in negotiating the Agreement prior to its formation, that he participated in causing its breach, and that he was involved in the ultimate diversion and non-payment of monies owed to Plaintiff. (ECF No. 40, pp. 10–12, 15–17). All of these actions required contact and communication with a South Carolina corporation and centered around a contract with a South Carolina choice of law provision. (ECF No. 27-2, p. 6). Of note, Boruff himself signed the Agreement which contained that choice of law provision. *Id.* For the same reasons stated above in the discussion of Lobetti, this Court finds that all factors of the *Consulting Eng'rs* test are met. Plaintiff has sufficiently alleged that Boruff reached into the forum state to solicit business; that he engaged in significant business activities in the forum state; that he personally signed an agreement that selected South Carolina law as the applicable law; that he made in-person contact with representatives of Plaintiff to discuss the business relationship; and that parties had numerous communications about the business being transacted. *See Consulting*

*Eng'rs*, 561 F.3d at 278. Further, Plaintiff has shown that the litigation arises out of or relates to Boruff's purposeful availment of the privilege of doing business here. *Id.* Lastly, no arguments have been raised to suggest that exercising personal jurisdiction over Boruff would be constitutionally unreasonable, and the Court's analysis of this factor as explained in its ruling as to FTRM applies here. *Id.* Thus, Boruff's motion to dismiss is denied.

### 4. Defendant Ford

Defendant Ford argues that he had no involvement in the transactions at issue between FTS and Plaintiff and that his sole trip to South Carolina to discuss business with Plaintiff is insufficient to create personal jurisdiction. (ECF No. 36, p. 3). The significance of Ford attending an in-person meeting in South Carolina to discuss the parties' business relationship does not warrant repetition. Additionally, Ford's affidavit contains the same allegations as the other individual Defendants', and Plaintiff's allegations to the contrary are the same allegations addressed above and are similarly effective to contravene Ford's allegations regarding his contacts with South Carolina. To the extent that Ford objects to the lack of exhibits specifically showing emails sent by him or communications from him, Ford is able to raise such arguments on a Motion for Summary Judgment. At this stage of the litigation, the Court is convinced that it would be premature to grant Ford's motion to dismiss due to a lack of evidence when the parties have not yet engaged in full discovery. All the Court must do at present is determine whether the Plaintiff's complaint is sufficient in light of its allegations, Ford's affidavit, and Plaintiff's competing affidavit. *See Wolf*, 745 F.2d at 908.

Ultimately, Plaintiff has sufficiently alleged that Ford reached into South Carolina to solicit business, that he engaged in significant business activities here, that he came here in person to discuss a business relationship with a South Carolina corporation, and that he was involved in

sufficient communications regarding the parties' business relationship to find that he purposefully availed himself of the privilege of doing business in South Carolina. *See Consulting Eng'rs*, 561 F.3d at 278. This Court need not consider his other visits to South Carolina to attend trade shows to find that its exercise of personal jurisdiction over him is proper. *See* (ECF No. 40, p. 16). Further, Plaintiff's claims against Ford arise out of or relate to his contacts with South Carolina. *See Consulting Eng'rs*, 561 F.3d at 278. Plaintiff's claims all pertain to Ford's solicitation of a business relationship with a South Carolina corporation for which he traveled to this state on at least one pivotal occasion, his negotiations and communications with that same corporation, and his role in procuring the breach of the contract with that corporation. Lastly, exercising personal jurisdiction over Ford is not constitutionally unreasonable. Litigating the suit here does not pose an undue burden on Ford, Boruff, or Lobetti, South Carolina has an interest in adjudicating a dispute regarding a corporation incorporated here, Plaintiff itself has a strong interest in obtaining convenient and effective relief, and this Court has been pointed to no contravening social policies of other states that warrant litigating this suit elsewhere. *Burger King Corp.*, 471 U.S. at 476–77. Thus, Ford's motion is denied.

## IV.    CONCLUSION

For all of the reasons stated above, Defendant Eaton's Motion to Dismiss Plaintiff's claims for breach of contract accompanied by a fraudulent act and violation of the SCUTPA is granted. (ECF No. 37). Defendant Eaton's Motion to Dismiss Plaintiff's claims for fraud/misrepresentation, constructive fraud, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of fiduciary duty owed to creditor—trust fund doctrine, civil conspiracy, tortious interference with contract, conversion, constructive trust, and quantum

meruit/unjust enrichment is denied. (ECF No. 37). Defendants FTRM, Lobetti, Boruff, and Ford's Motion to Dismiss (ECF No. 36) is denied.


IT IS SO ORDERED.


July 29, 2024                                             Joseph F. Anderson, Jr.
Columbia, South Carolina                    United States District Judge