IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Brabham Oil Company, Inc., | C/A No. 5:24-cv-1170-JFA |
| Plaintiff, | |
| v. | |
| Fuel Trader Supply, LLC, Blue Earth Resources, Inc., Fuel Trader Resource Management, Inc, William R. Eaton, Scott M. Boruff, Charles B Lobetti, III, Gary W. Ford, Jr., | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

## I.    INTRODUCTION

This matter is before the Court on Defendant Gary W. Ford, Jr.'s ("Ford" or "Defendant") Motion for Summary Judgment. (ECF No. 137). Specifically, Ford moves for entry of Summary Judgment for lack of personal jurisdiction, and as to each of Plaintiff Brabham Oil Company Inc.'s, ("Plaintiff" or "Brabham") causes of action against him. *Id.* This matter has been fully briefed and is ripe for review. (ECF Nos. 137, 140 & 141). Additionally, a hearing was scheduled and argument regarding this motion was heard on May 13, 2026. For the reasons stated herein, Ford's Motion for Summary Judgment is granted in part and denied in part.

## II.    FACTS

This case arises out of a longstanding business relationship between Plaintiff and Fuel Trader Supply, LLC ("FTS"), Fuel Trader Resource Management, Inc. ("FTRM"),

and Blue Earth Resources, Inc. ("BERI") (collectively "Corporate Defendants"). In 2018, Plaintiff entered into buy-sell agreements with FTS whereby Plaintiff paid FTS for the purchase of certain fuel products. (ECF No. 27, p. 6). FTS would then purchase products, sell them to customers, and repay Plaintiff for money received plus interest. *Id.* It appears this buy-sell arrangement proceeded without incident from 2018 until 2022. In September 2022, BERI acquired FTS and FTRM. Ultimately, a breakdown in this buy-sell arrangement occurred. Plaintiff sued the Corporate Defendants as well as William R. Eaton ("Eaton"), Ford, Charles B. Lobetti ("Lobetti"), and Scott M. Boruff ("Boruff")—officers of the Corporate Defendants in their official capacities—on several causes of action. Further, Eaton and Ford filed cross claims against the Corporate Defendants for indemnity of any costs and judgments against them arising from Plaintiff's claims. (ECF Nos. 68 & 72).

Plaintiff contends at some point after September 2022, "Defendants began fraudulently moving Brabham['s] funds obtained under the buy-sell relationship to BERI and began encouraging Brabham [] to execute a new buy-sell agreement so that they could continue their fraud." (ECF No. 140, p. 3). Plaintiff further contends that under the January 2023 buy-sell agreement, Brabham continued to advance monies to FTS to buy fuel; however, FTS "at the behest of [BERI] and its controlling principals, including Ford— began diverting monies owed to Brabham [] to [BERI] and other unauthorized third-party recipients without Brabham['s] [] knowledge or consent, for their own benefit, leading to [FTS's] demise and inability to repay Brabham." *Id.* at 3–4.

2

Ford was a salaried employee of BERI. (ECF No. 137, p. 2). He was employed as the President of BERI from September 15, 2022, to September 25, 2023. *Id.* at 2 (citing ECF No. 72). Ford avers that he knew of and had heard of Brabham but was not aware of the buy-sell arrangement. *Id.* at 2. Conversely, Brabham argues Ford "not only knew about the Buy-Sell Agreement at issue here, but he also knew about the prior buy-sell agreement." (ECF No. 140, p. 4). Further, Brabham contends Ford's actions of helping put together a pitch deck for the renewal of the buy-sell agreement; attendance at the meeting in Bamberg, South Carolina with Eaton and Boruff to pitch the renewal of the buy-sell agreement; and helping set up the stock that Brabham's related entity received from the deal after the fact reveals his knowledge and involvement in the buy-sell arrangement. *Id.*

On December 13, 2022, a meeting took place in Bamberg, South Carolina ("Bamberg Meeting") between Plaintiff's principles, Brab McCully ("McCully") and Brian Bowen ("Bowen"), and Defendants Eaton, Ford, and Boruff. (ECF No. 137, p. 3). While admittedly present, Ford cites the deposition testimony of Bowen wherein he states Ford said very little at that meeting and made no statements regarding BERI ownership or the buy-sell agreement. *Id.* (citing ECF No. 137-3, pp. 5–8). At the meeting, a proposed continuation and amendment of the pre-existing buy-sell arrangement between Plaintiff and Defendant FTS was discussed. *Id.* Ford resigned from BERI effective September 29, 2023. *Id.*

3

Brabham presents that Ford "directly participated in the conduct with Eaton and others that expressly caused [FTS] to breach the Buy-Sell Agreement as well as defraud Brabham …." (ECF No. 140, p. 5). Brabham avers Ford participated by "manufacturing (at best) or falsifying (at worst) intercompany invoices." *Id.* Circumstantial evidence in the record suggests that these "false"[1] invoices were sent to Brabham and intended to induce it to believe the buy-sell requests were a legitimate request to purchase fuel when really, they were to satisfy BERI's capital needs or operating expenses. Ford, however, disputes creating these invoices. (ECF No. 141, p. 5). Ford contends "Plaintiff has the wrong Billy." *Id.* Rather, Ford argues there is clear deposition testimony that the invoice was created by Billy Phipps, the Chief Marketing Officer, not Billy Ford. *Id.*

Ford moves for summary judgment for lack of personal jurisdiction, and as to the merits of all causes of action against him. (ECF No. 137). These causes of action specifically against Ford include: (1) Breach of Contract Accompanied by Fraudulent Act; (2) Breach of Fiduciary Duty ; (3) Fraud/Misrepresentation ; (4) Constructive Fraud; (5) Violation of South Carolina Unfair Trade Practices Act; (6) Negligent Misrepresentation; (7) Aiding and Abetting Breach of Fiduciary Duty; (8) Breach of Fiduciary Duties to Creditor; (9) Civil Conspiracy; (10) Conversion; (11) Constructive Trust; (12) Quantum Meruit/Unjust Enrichment; and (13) Tortious Interference with Contract. (ECF No. 27 (causes of action not asserted against Ford omitted from count)). Plaintiff states that it is

---

[1] The Undersigned addressed the issue of this "false" or "fraudulent" invoice at the hearing. The Court acknowledges that whether this invoice was indeed "fraudulent" appears to remain in dispute.

not pursuing its cause of action for breach of contract accompanied by a fraudulent act against Ford, (ECF No. 140, p. 13), thus Ford's motion is granted as to that cause of action. However, Brabham opposes all other relief sought by Ford.

### III.     <u>STANDARD OF REVIEW</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## IV.     DISCUSSION

Ford argues he is entitled to summary judgment both as to (a.) personal jurisdiction; and (b.) the merits of Plaintiff's claims. All arguments are addressed herein.

### a.  Personal Jurisdiction

Ford argues that this Court lacks personal jurisdiction over him. Ford previously raised this issue before the Court in his Motion to Dismiss. (ECF No. 36). This Court denied Ford's Rule 12(b)(2) motion without prejudice, stating that it would have been premature to grant Ford's motion to dismiss when the parties had not yet engaged in full discovery as to Ford's involvement in this matter. (ECF No. 51). Discovery has since been completed, and Ford has renewed his request that this Court determine it lacks personal jurisdiction.

"When a federal court sits in diversity, it has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (citation modified) (internal citation omitted). In evaluating a challenge to personal jurisdiction under a state's long-arm statute, the court engages in a two-step analysis. *See Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993). First, the state's long-arm statute must authorize the exercise of jurisdiction under the facts presented. *Id.* Second, if the statute does authorize jurisdiction, the court must then determine if the statutory assertion of personal jurisdiction is consistent with due process. *Id.* South Carolina's long-arm statute has been interpreted to extend to the outer limits allowed by the Due Process Clause.

6

*See Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). Thus, the only question before the court is whether the exercise of personal jurisdiction would violate due process. *See ESAB Grp., Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 328 (D.S.C. 1999). The due process test for personal jurisdiction involves two components: minimum contacts and fairness. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980).

Under the minimum contacts test, a non-resident defendant must have certain minimum contacts such that the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945). Due process is satisfied if the court asserts personal jurisdiction over a defendant who "purposefully avails itself of the privilege of conducting activities with the forum state," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen*, 444 U.S. at 297. After a showing of the party's purposeful availment, the reasonableness inquiry balances any burden on the defendant against countervailing concerns such as the plaintiff's interest in obtaining relief and the forum state's interest in the controversy. *See id.* at 292.

At the summary judgment stage, the plaintiff bears the burden of showing personal jurisdiction exists. *See Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 835 (D.S.C. 2015). A party may be subject to the court's power either through general personal

jurisdiction or specific personal jurisdiction.[2] "When a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state . . ., he is subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process." *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052, 1064 (4th Cir. 1983) (citation modified). "In other words, corporate defendants are not insulated from jurisdiction simply because their forum-related actions were performed in their official capacity."[3] *Doe 9 v. Varsity Brands, LLC*, 679 F. Supp. 3d 464, 490-91 (D.S.C. 2023). "Rather, when the forum's long-arm statute extends to the limit of federal due process, jurisdiction is proper upon some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury, such as when the defendant was the guiding spirit or central figure behind the wrongful conduct." *Id.* at 491 (citation modified) (internal citation omitted).

The Fourth Circuit has established a three-part test for evaluating the propriety of exercising specific jurisdiction: (1) whether and to what extent the defendant purposely availed itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claims arise out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d

---

[2]  The parties do not meaningfully dispute that Ford is not subject to general jurisdiction. Accordingly, the personal jurisdiction analysis continues relevant to specific jurisdiction.

[3]  This Court previously addressed Defendant's attempt to invoke the fiduciary shield doctrine. (ECF No. 51, p. 31). The Court declines to revisit its ruling and instead continues its analysis consistent with its prior order.

8

209, 215–216 (4th Cir. 2001) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984); *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 476–77 (1985)).

In this matter, Brabham has satisfied its burden in showing that subjecting Ford to this Court's jurisdiction comports with due process. Ford argues his attendance at a singular meeting in South Carolina is not sufficient to establish the requisite minimum contacts. (ECF No. 137, p. 9). In so arguing, Ford cites[4] *Booze Pops LLC v. Real Est. Flipz, Inc.,* wherein the court found it lacked personal jurisdiction over a defendant. No. 2:20-CV-691-RMG, 2020 WL 3420716, at *7 (D.S.C. June 21, 2020). The *Booze Pops* court found it lacked personal jurisdiction as the only evidence pointing towards contact with the relevant state was one visit in which the defendant accompanied the other defendant, and the *other* defendant spoke to and attempted to elicit information from the plaintiff's employees regarding the basics of the plaintiff's operations. *Id.* The *Booze Pops* court found this lone visit did not establish minimum contacts with the forum. *Id.* Ford's actions are distinguishable from that of the *Booze Pops* defendant.

As the Court has already discussed in its previous order addressing this argument at the motion to dismiss stage, although one in-person meeting alone is not always sufficient to create specific personal jurisdiction, this meeting—which took place in South Carolina—was significant to the facts of this case. (*See* ECF No. 51, p. 35). Here, the facts

---

[4]  Ford also brought *Ormand-Ward by & through CDM Corp. v. Litt*, 447 S.C. 341, 361, 926 S.E.2d 259, 269 (Ct. App. 2025), *reh'g denied* (Mar. 13, 2026) to this Court's attention. As discussed at the hearing, this case is distinguishable from Ford's actions.

indicate the Bamberg Meeting was one of the driving forces behind the renewal of the buy-sell agreement which Plaintiff ultimately alleges was breached. (ECF No. 140, p. 10). Defendant Eaton stated in his deposition that this meeting is where the discussion regarding the details of the January 1, 2023, buy-sell agreement took place. (ECF No. 140-4, Eaton Depo. Tr. at 120:9–11). The record also indicates Ford assisted in preparing a pitch deck to present at this meeting. (ECF No. 140-5, Ford Depo. Tr. at 76:23–25, 77:2–5). Additionally, Ford's presence at the meeting appeared purposeful to aid in the negotiations. (ECF No. 140-4, pp. 16–17 ("[Ford] had a lot of fuel experience along with the FT - - Fuel Trader Entities, that we felt like what we were bringing to the market with BERI, [FTS], and FTRM was a very unique situation that all those companies would complement each other to where we would have delivered business, we would have line space, we would have rack product, and it would have been somewhat of a unique company.")).  Thus, while Ford argues he did not participate much in the meeting itself and rather it was Eaton and Boruff that proposed the continuation and amendment of the pre-existing buy-sell agreements, his attendance at the meeting is not disputed. Ford cites the deposition testimony of Brian Bowen wherein he states that Ford spoke very little at the Bamberg Meeting and made no statements regarding BERI's ownership or the buy-sell agreement. (ECF No. 137-3, Bowen Dep. 252:19–253:3). Further, Ford cites Bowen's statement that the only time he ever saw or spoke with Ford was at the Bamberg Meeting. *Id.* at 237:2–5.

Ultimately, a review of the record reveals that Ford traveled to South Carolina on at least one occasion to attend a meeting that was pivotal to Brabham's continued

participation in the buy-sell arrangement. Further, Ford assisted in preparing for this meeting and was not simply a spectator to Eaton and Boruff as he alleges. Accordingly, the Undersigned is satisfied that Ford had sufficient personal involvement such that he was at minimum a "guiding spirit" in "some decision or action which is causally related to [Brabham's] injury." *See Doe 9,* 679 F. Supp. 3d at 491. Further, his actions with the forum state made it reasonable for Ford to expect to be haled into court here. Therefore, Ford's motion for summary judgment as to personal jurisdiction is denied.

### b. Liability

#### i. Breach of Fiduciary Duty, Breach of Fiduciary Duty to Creditor, Aiding and Abetting Breach of Fiduciary Duty. (COA 5, 10 & 11)

Ford first requests that this Court grant summary judgment as to Plaintiff's fifth and eleventh causes of action for Breach of Fiduciary Duty, and Breach of Fiduciary Duty to Creditor. (ECF No. 137, p. 12). Ford also seeks summary judgment as to the merits of Plaintiff's tenth cause of action, Aiding and Abetting Breach of Fiduciary Duty. *Id.* at 15. In so arguing, Ford presents the following: (1) Plaintiff's buy-sell relationship was with FTS—Ford was merely an officer of BERI; (2) the record reflects "Ford had no dealings with Plaintiff concerning the: (i) buy-sell; (ii) extensions; (iii) ownership; (iv) bank control; (v) or fund transfers," *Id.* (citation modified); (3) there is no evidence Plaintiff reposed trust in Ford personally or that Ford undertook fiduciary obligations toward Plaintiff; (4) Ford did not have accounting access, did not request or process extensions, and did not engage Plaintiff about repayments; and (5) funds that flowed from Plaintiff to FTS after September 2023 occurred after Ford had resigned. *Id.*

Conversely, Brabham argues it has presented evidence that establishes Ford owed a fiduciary duty to Brabham, and that this duty was breached. Brabham argues that Ford was aware of the worsening financial state of BERI, and yet knowingly participated in conduct that enticed Brabham to continue its working relationship with FTS. Further, Brabham alleges Ford falsified invoices, which then prompted Brabham to continue sending over funds that would become unsecured because they were not used to purchase fuel as Brabham was led to believe.

"To establish a claim for breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty, (2) a breach of that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from the wrongful conduct of the defendant." *Scott v. Catawba Valley Brewing Co.*, No. 2:18-CV-1539-RMG, 2018 WL 3966261, at *3 (D.S.C. Aug. 17, 2018) (quoting *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 335–36, 732 S.E.2d 166, 173 (2012)) (internal quotations omitted). "[T]o determine whether a fiduciary relationship existed, [courts] must look to the particulars of the relationship between the parties." *Armstrong v. Collins*, 366 S.C. 204, 222, 621 S.E.2d 368, 377 (Ct. App. 2005) (citation omitted). A fiduciary relationship may exist when "one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other …" *Jacobson v. Yaschik*, 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967).

12

A fiduciary relationship requires that "[t]he other party must have actually accepted or induced the confidence placed in him." *Regions Bank v. Schmauch*, 354 S.C. 648, 582 S.E.2d 432 (Ct. App. 2003). "Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties." *Thomas v. Am. Workmen*, 197 S.C. 178, 178, 14 S.E.2d 886, 888 (1941).

To establish a cause of action for aiding and abetting breach of fiduciary duty, a plaintiff must prove: (1) a breach of fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages. *Stegelin v. Pac. Life Ins. Co.*, 592 F. Supp. 3d 474, 485 (D.S.C. 2022), *aff'd sub nom. Gugel v. Pac. Life Ins. Co.*, No. 23-1073, 2024 WL 194172 (4th Cir. Jan. 18, 2024) (citing *Vortex Sports & Ent., Inc. v. Ware*, 378 S.C. 197, 662 S.E.2d 444, 448 (2008)).

Here, the first issue this Court must address in assessing these causes of action is whether Ford owed a fiduciary duty to Brabham. Upon a review of the record, the Undersigned finds that sufficient evidence exists to warrant a determination that Ford owed a fiduciary duty to Brabham. Ford presents deposition testimony by Bowen, a principle of Brabham, wherein he states that his only contact with Ford regarding the buy-sell

13

agreements was at the Bamberg Meeting where the negotiations regarding the buy-sell agreement took place. (ECF No. 137-3, pp. 5–6). Bowen further states that Ford did not say much at the meeting, and that he had not spoken with Ford since. *Id.* While this may cast doubt on the allegation that Brabham placed "special trust" in Ford sufficient to form a fiduciary relationship, Brabham presents deposition testimony by Eaton wherein he states that at the Bamberg Meeting, part of the negotiations with Brabham included discussing the "longstanding relationship" that Eaton, Ford, and Boruff all had together. (ECF No. 140-4, pp. 16–17 ("[Ford] had a lot of fuel experience along with the FT - - Fuel Trader Entities, that we felt like what we were bringing to the market with BERI, [FTS], and FTRM was a very unique situation that all those companies would complement each other to where we would have delivered business, we would have line space, we would have rack product, and it would have been somewhat of a unique company.")).

Thus, while Ford may not have been directly involved in communications with the principles of Brabham moving forward, his presence in the corporate structure appeared to be a driving point in the negotiations for the operative buy-sell agreement. Further, the record reflects ongoing emails discussing the Brabham buy-sell agreement and issues the company was having in securing these payments which Ford was either directly involved in sending or had at least been copied on. Thus, there is evidence to suggest Ford owed a fiduciary duty to Brabham.

The next issue in assessing these causes of action is whether Ford breached a fiduciary duty. Brabham has presented enough evidence to move beyond summary

14

judgment as to Ford's potential breach of fiduciary duty. Evidence regarding Ford's actions discussed throughout this order reveals a dispute of material fact as to whether Ford breached his fiduciary duty. The record reflects that Ford, at a minimum, disseminated "fraudulent" invoices indicating that payment received by Brabham was secured by a fuel purchase when in fact the money may have been directed to helping BERI's finances instead. (ECF Nos. 140-18, 140-19 & 140-21). Further, as discussed in relation to Brabham's position as a potential creditor to BERI, the record indicates Ford, while not having direct access to BERI's accounts, was aware of the worsening financial situation and the potential that the Brabham account may not be able to be repaid due to the worsening situation. (ECF Nos. 140-2 & 140-16). Despite this knowledge, the record reflects that Ford did not disclose any financial difficulties and may not have favored Brabham as a creditor as the company approached potential insolvency.

These facts also support denying Ford's motion regarding the Aiding and Abetting Breach of Fiduciary Duty cause of action. The record indicates that even if Ford himself was determined to not owe a fiduciary duty to Brabham, he was aware of actions that were taking place such that the contract with Brabham was not be being carried out as agreed. Certainly, FTS as the holder of the agreement, and the entity that was entrusted with these finances, can be found to have owed a fiduciary duty. Despite alleging he was not aware of the terms of the buy-sell agreement, there are facts that contradict Ford's assertion such as his presence at the Bamberg Meeting where a significant portion of the buy-sell agreement was apparently discussed. Further, Ford is copied on a significant amount of

emails which discuss concerns over the Brabham account. Ford's lack of access to accounting systems does not absolve Ford of liability. Finally, while Ford contends that he did not create the "fraudulent" invoice but rather it was created by Billy Phipps, Ford is the one that disseminated this invoice via email. (ECF No. 140-14). These contentions reveal a dispute of material fact over whether Ford aided and abetted a breach of a fiduciary duty.

Accordingly, this Court denies Ford's Motion for Summary Judgment as to Plaintiff's claims of Breach of Fiduciary Duty and Breach of Fiduciary Duty to Creditor. Further, Ford's Motion for Summary Judgment is denied as to Aiding and Abetting Breach of Fiduciary Duty.

### ii. Fraud, Negligent Misrepresentation, Constructive Fraud (COA 6, 7, & 9)

Ford requests that this Court grant summary judgment as to Plaintiff's sixth, seventh, and ninth causes of action for Fraud, Negligent Misrepresentation, and Constructive Fraud. (ECF No. 137, p. 12).

To establish a cause of action for fraud, a plaintiff must prove that there was (1) a representation; (2) it was false; (3) it was material; (4) either a defendant's knowledge of its falsity or a reckless disregard to its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Cantrell v. New Penn Fin., LLC*, No. 7:17-CV-01078-DCC, 2018 WL 4403392, at *3 (D.S.C. Sept. 17, 2018) (citing *Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45 (S.C. Ct. App. 2010)). "To establish constructive fraud, all elements of actual fraud except for

16

the element of intent must be established." *Id.* (quoting *O'Quinn v. Beach Assocs.*, 249 S.E.2d 734, 738 (S.C. 1978)) (citation modified).

To sustain an action for negligent misrepresentation, a plaintiff must show: (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that they communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered pecuniary loss as the proximate result of the plaintiff's reliance on the representation. *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 822 (D.S.C. 2011), *on reconsideration in part* (Jan. 11, 2012) (citing *Quail Hill, LLC v. Cnty. of Richmond*, SC, 387 S.C. 223, 692 S.E.2d 499, 508 (2010)) (citation omitted). "The key difference between fraud and negligent misrepresentation is that fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement." *Id.* (citation modified).

Here, Ford argues he is entitled to summary judgment because "[t]here is no representation—let alone a false one—made by Ford, to Plaintiff." (ECF No. 137, p. 13). Conversely, Brabham argues there is sufficient evidence to create a dispute of material fact on these causes of action. Brabham cites to the "fraudulent" invoice it alleges Ford created, as well as Ford's participation in and preparation for the Bamberg Meeting where Brabham contends Ford, Eaton, and Boruff overstated the viability of conducting further business and hid the true state of the Corporate Defendants' finances. (ECF No. 140, p.p. 15–16).

17

Here, the evidence viewed in the light most favorable to Brabham supports the conclusion that Ford took active measures, by conduct and expression, to deceive Brabham. While Brabham may not be able to point to a specific statement that Ford made, Ford's involvement in the "fraudulent" invoice for which circumstantial evidence suggests Brabham may have received, and was likely intended to persuade Brabham that the entire payment they were making would be secured by the purchase of fuel when in fact some was to be used for BERI operating expenses, (ECF No. 140-19), can almost certainly be considered a fraudulent representation. While Ford disputes creating this invoice and rather contends Billy Phipps made the invoice, the record still reflects that even if Ford did not create the invoice, he did disseminate the invoice to the other corporate officers working for FTS. *Id.* Further, at the time Ford attended the Bamberg Meeting and when he helped prepare the pitch deck for the meeting, the record reflects Ford was aware they were painting a "rosy" picture for Brabham of the current state of the Fuel Trader entities. While mere puffery may not be sufficient to permit a cause of action for fraud or negligent misrepresentation, knowingly withholding information that would be material to a party's participation in an agreement is sufficient to get this cause of action beyond summary judgment.

Accordingly, Ford's Motion for Summary Judgment as to Brabham's causes of action for Fraud, Constructive Fraud, and Negligent Misrepresentation is denied.

18

### iii. Violation of the South Carolina Unfair Trade Practices Act (COA 8).

Next, Ford requests that this Court grant summary judgment in his favor as to Brabham's cause of action for violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). (ECF No. 137, p. 14).

SCUTPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).To sustain an action for violation of SCUTPA, a plaintiff must prove: (1) the defendant engaged in an unlawful trade practice; (2) the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice; and (3) the unlawful trade practice engaged in had an adverse impact on the public interest. *Brooks v. GAF Materials Corp.*, 41 F. Supp. 3d 474, 487 (D.S.C. 2014).

The parties' dispute as to this cause of action primarily centers around whether Brabham has shown that Ford's alleged conduct had "an impact on the public interest," the third of the elements to consider in evaluating a SCUTPA claim. To satisfy this element, Brabham can show either that "the same kind of actions occurred in the past" or that "the company's procedures create a potential for repetition of the unfair and deceptive acts." *Turner v. Kellett*, 426 S.C. 42, 47–48, 824 S.E.2d 466, 469 (Ct. App. 2019). Conduct which only affects the parties to the transaction provides no basis for a [SC]UTPA claim." *Jefferies v. Phillips*, 316 S.C. 523, 527, 451 S.E.2d 21, 23 (Ct. App. 1994).

Plaintiff avers that "Ford creating, approving, and/or submitting a false invoice constitutes an unfair and deceptive trade practice." (ECF No. 140, p. 28). Further, Brabham

19

argues that "Ford has a history of perpetrating these unfair and deceptive business practices in regard to the Brabham Oil Buy-Sell Agreement, . . . making it likely the unfair and deceptive practices will continue." *Id.* at 29. First, conduct that only affects the parties to the transaction, i.e. the former Brabham buy-sell agreements, does not provide a basis for a SCUTPA claim. In another attempt to satisfy the public interest prong, Brabham argues that Ford helped perpetrate similar acts against Apex, another company the fuel trader entities were conducting business with. Brabham argues that when BERI took out a $5.1 million Apex Loan to purchase Fuel Trader in September 2022, BERI had a $1 million loan with Apex on the books. Further, Brabham argues that Ford, Boruff, and Boruff's wife "loaned [BERI] funds to pay off that first loan with Apex just to get paid back by the new Apex Loan weeks later." (ECF No. 140, p. 29).

While Brabham certainly points to past questionable behavior on part of Ford and the Corporate Defendants, these facts do not bring this action under SCUTPA's embrace. These prior acts, which were materially different than Brabham's claims here, along with no indication Ford is anticipated to engage in further unfair business practices leads to this Court's determination that Ford's Motion for Summary Judgment as to Plaintiff's SCUTPA claim be granted.

### iv. Civil Conspiracy (COA 12)

Ford requests that this Court grant summary judgment as to Plaintiff's civil conspiracy cause of action. (ECF No. 137, p. 16).

To establish a cause of action for civil conspiracy, a plaintiff must prove: (1) the combination or agreement of two or more persons; (2) to commit an unlawful; act or a lawful act by unlawful means; (3) together with the commission of an overt act that is in furtherance of the agreement; and (4) damages proximately resulting to the plaintiff. *Paradis v. Charleston Cnty. Sch. Dist.*, 433 S.C. 562, 574, 861 S.E.2d 774, 780 (2021).

Ford argues that there is no evidence that he agreed with anyone to mislead Plaintiff. (ECF No. 137, p. 16). Ford contends that the "only potential 'conspiracy' that exists in this case pertains to the 'war chest' comment by Lobetti, which occurred well-after Ford resigned from his position at BERI." *Id.*

Ford's motion for summary judgment on this cause of action is denied. The record supports that Ford had a hand in creating and/or distributing a false invoice which was likely intended to persuade Brabham to continue sending over funds under the buy-sell agreement with the assumption the funds would be secured by the purchase of fuel. However, some of these funds were ultimately directed to BERI, in contravention to the invoice created and/or disseminated intraoffice by Ford. Further, when emails regarding financials were exchanged between the corporate officers, Ford stated: "Brabham getting squirrelly." (ECF No. 140-36). Thus, there is some evidence sufficient to survive summary judgment that Ford, in the combination or agreement of two or more persons, agreed to commit an unlawful act, from which Plaintiff suffered damages. Thus, Ford's motion for summary judgment as to the civil conspiracy claim is denied.

### v. Conversion (COA 13)

Ford requests that this Court grant his motion for summary judgment as to Plaintiff's conversion claim. (ECF No. 137, p. 16).

For a plaintiff to recover in an action for conversion, it must prove: (1) an interest by the plaintiff in the thing converted; (2) that the defendant converted the property for his own use; and (3) this use was without the plaintiff's permission. *May v. Peninger*, No. 2:07-CV-00864CWH, 2008 WL 509470, at *12 (D.S.C. Feb. 22, 2008) (citation omitted).

Ford argues that he is entitled to summary judgment because Plaintiff's accountant, Bowen, testified in his deposition that he had no information indicating that Ford received any of Plaintiff's money or possessed any "settled funds." (ECF No. 137, p. 16). Further, Ford points to the lack of "testimony or document showing Ford exercised dominion over Plaintiff's property or directed such conduct or personally received any such property or funds." *Id.* at 16–17.

Here, Ford's motion as to Plaintiff's claim of conversion is granted. Brabham's basis for arguing conversion is that had their funds not been inappropriately directed to BERI, BERI would have needed to make personnel cuts and payroll would have been affected. (ECF No. 140, p. 21 citing Ford Depo Tr. at 127 "Without additional funds coming in, it would have been difficult to continue to operate without cuts."). Thus, Brabham argues that because Ford continued to receive a salary, bonuses, and had two loans paid back to him, this Court should find that Ford converted these funds for his own use. This argument is ineffective. There is no indication that Ford as president of BERI

22

ever had any dominion or control over the monies paid by Brabham to FTS. While he continued to receive a salary from the company, there is no indication that this salary was directly attributable to the money provided by Brabham, nor is there any evidence Ford himself had any control over the payroll. Thus, Ford's motion for summary judgment is granted as to Plaintiff's claim of conversion.

### vi. Constructive Trust, Quantum Meruit/Unjust Enrichment (COA 14 & 15)

Ford asks this Court to grant summary judgment as to Plaintiff's causes of action for constructive trust and Quantum Meruit/Unjust Enrichment.

To establish a claim for constructive trust, a plaintiff must present evidence showing that the defendant obtained property which the defendant cannot in good conscious retain or withhold from another who is beneficially entitled to it. *In re Worldwide Wholesale Lumber, Inc.*, 372 B.R. 796, 813 (Bankr. D.S.C. 2007) (citing *SSI Medical Services, Inc. v. Cox*, 301 S.C. 493, 392 S.E.2d 789, 793–794 (1990)). Similarly, to prevail on a quantum meruit/unjust enrichment claim, a plaintiff must establish that: (1) it conferred a benefit upon the defendant; (2) the defendant realized that benefit; and (3) the defendant retained that benefit under circumstances that make it inequitable for the defendant to retain it without paying its value. *Gillins v. Celadon Trucking Servs., Inc.*, No. 2:16-CV-00795-DCN, 2016 WL 4455018, at *5 (D.S.C. Aug. 24, 2016) (quoting *Williams Carpet Contractors, Inc. v. Skelly*, 734 S.E.2d 177, 180 (S.C. Ct. App. 2012)). "Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been

23

unjustly enriched at the expense of plaintiff." *Id.* (citing *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E.2d 430, 434 (S.C. 2009)).

Here, for largely the same reasons discussed when addressing Plaintiff's cause of action for conversion, Ford's motion for summary judgment is granted. Brabham asserts the same facts to support its argument for constructive trust and quantum meruit as it does for its conversion claim. Accordingly, the claim rises and falls for the same reason their claim of conversion did. Brabham has failed to show that Ford's continued acceptance of a salary and bonus from BERI while their monies under the buy-sell agreement were being misappropriated constitutes relief under a theory of constructive trust or quantum meruit/unjust enrichment. Ford was entitled to a salary and bonus from BERI regardless of its conduct with the Brabham funds. While Ford did testify in his deposition that if the funds from Brabham hadn't been received, BERI's payroll may have been impacted, that fact does not create a cause of action for a constructive trust or quantum meruit/unjust enrichment. Thus, Ford's motion as to the constructive trust and quantum meruit/unjust enrichment claims is granted.

### vii. Tortious Interference with Contract (COA 16)

Ford also requests that this Court grant his motion for summary judgment as to Plaintiff's claim of Tortious Interference with Contract. (ECF No. 137, p. 18).

"The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages."

*Dutch Fork Dev. Grp. II, LLC v. SEL Props., LLC,* 406 S.C. 596, 604, 753 S.E.2d 840, 844 (2012) (quoting *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993)).

Ford argues that there is no evidence that he intentionally procured any breach of the buy-sell agreement or had any involvement with it and is accordingly entitled to summary judgment on this claim. (ECF No. 137, p. 18). Conversely, Brabham argues that Ford knew of the buy-sell agreement's existence as well as the fact that all funds advanced from Brabham to FTS had to be secured. (ECF No. 140, p. 19). Further, Brabham argues that FTS, "with Ford's involvement and knowledge and at his direction, removed funds due to Brabham [] from the buy-sell ecosystem/relationship without Brabham['s] knowledge or agreement." *Id.* Additionally, Brabham contends that Ford directly participated in and benefited from the diversion of funds owed to Brabham under the buy-sell agreement for unauthorized uses such as BERI payroll expenses and repayment of the Apex loan. *Id.* at 19–20.

While Brabham has provided evidence that Ford was aware of the contract between Brabham and FTS, there was not sufficient justification for any breach of that contract, and that Brabham suffered damages, it has failed to show Ford intentionally procured that breach. The record suggests Ford did not have any access to FTS bank accounts. Thus, while funds may have been wrongfully exchanged between FTS and BERI in breach of the buy-sell agreement, there is no evidence that Ford, despite possibly being aware of this, *procured* this breach. Awareness that a contract is being breached does not lead to the

25

conclusion that the party intentionally procured that breach. Thus, Ford's motion as to Brabham's cause of action for tortious interference with contract is granted.

## V.     CONCLUSION

For the reasons stated herein, Ford's Motion for Summary Judgment (ECF No. 137) is granted in part and denied in part.

IT IS SO ORDERED.

May 18, 2026
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge

26